**THE OSAGE TRIBE OF INDIANS OF OKLAHOMA, Plaintiff,**

v.

**The UNITED STATES of America, Defendant.**

Nos. 99–550 L, 00–169 L.

United States Court of Federal Claims.

April 30, 2010.

Wilson K. Pipestem, Washington, DC, for plaintiff.

Joseph H. Kim, with whom were Ignacia S. Moreno, Assistant Attorney General, and Romney S. Philpott and Brian M. Collins, Environment & Natural Resources Division, U.S. Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

HEWITT, Chief Judge.

Before the court is an action brought by the Osage Tribe of Indians of Oklahoma [1] (Tribe or plaintiff) seeking damages from the United States (government or defendant) for the Bureau of Indian Affairs Osage Agency's (Osage Agency's) alleged failure to collect and invest revenues generated from the Osage mineral estate in breach of the government's fiduciary duties as trustee. Plaintiff Osage Nation's Amended Motion for Summary Judgment on All Oil–Royalty Under–Collection Claims for July 1974 to December 2000 and All Deposit–Lag, Excessive–Cash–Balance, and Investment–Yield Claims for Accounts 7386 and 7886 for United States Fiscal Years 1973 to 1992 (plaintiff's Motion or Pl.'s Mot.), 2, Docket Number (Dkt. No.) 407.

## I. Background

This matter has been before the court since August 2, 1999. Detailed discussions of the history of the dispute, the procedural history and the outcome of prior proceedings are contained in the court's prior opinions.[2] The court provides a brief summary here.

In March 2005, the court divided plaintiff's claims into two tranches: Tranche One encompasses the Tribe's trust fund mismanagement claims within the parameters established by the United States Court of Appeals for the Federal Circuit in Shoshone Indian Tribe of Wind River Reservation v. United States (Shoshone), 364 F.3d 1339, 1350–51 (Fed.Cir.2004), and Tranche Two covers all other claims. Order of Apr. 15, 2005, Dkt. No. 194 (filed in The Osage Nation and/or Tribe of Indians of Okla. v. United States, Case No. 00–169L, prior to case consolidation); Osage Tribe of Indians of Okla. v. United States (Osage II), 72 Fed.Cl. 629, 631 (2006).

On October 27, 2005, in response to the government's motion to dismiss in part the Tribe's suit, the court issued the opinion underpinning this entire action: as a matter of law, the Tribe is entitled to damages for the government's breach of its fiduciary duties. In Osage Tribe of Indians of Oklahoma v. United States (Osage I), 68 Fed.Cl. 322 (2005), the court held that legislation passed in 1906 pertaining to administration of the lands given to the Tribe, Act of June 28, 1906, ch. 3572, 34 Stat. 539 (1906 Act) (providing for the division of the lands and funds of the Osage Indians in Oklahoma Territory), imposed upon the United States a specific fiduciary duty to hold in trust the moneys contractually owed to the Tribe pursuant to oil and gas leases, including the duty to verify that proper royalties were paid to the Tribe under the terms of those leases. Osage I, 68 Fed.Cl. at 327. The court declined to determine the standard to which the government should be held in carrying out its duty to invest the Tribe's royalties pursu-

---

1. The original complaint in this case was filed on August 2, 1999 by "The Osage Nation and/or Tribe of Indians of Oklahoma" and assigned case number 99–550L. Two amendments to that complaint were filed under the name "The Osage Tribe of Indians of Oklahoma" in March and August of 2004. A separate case was filed by "The Osage Nation and/or Tribe of Indians of Oklahoma" on March 31, 2000 and assigned case number 00–169L. The cases were consolidated by the court on September 14, 2005 and the earlier-filed suit, Case No. 99–550L, was des-

ignated the lead case. Order of Sept. 14, 2005, Docket Number (Dkt. No.) 233.

2. *Osage Nation a/o Tribe of Indians of Okla. v. United States*, 57 Fed.Cl. 392 (2003); *Osage Tribe of Indians of Okla. v. United States (Osage I)*, 68 Fed.Cl. 322 (2005); *Osage Tribe of Indians of Okla. v. United States (Osage II)*, 72 Fed.Cl. 629 (2006); *Osage Tribe of Indians of Okla. v. United States (Osage III)*, 75 Fed.Cl. 462 (2007).

ant to the 1906 Act, reserving that issue for further briefing and trial. *Id.* at 335–36.

Following this ruling, the parties prepared to go to trial on plaintiff's Tranche One allegations: that "the United States violated its duty as trustee of the Osage mineral estate by failing to collect all moneys due from Osage oil leases and to deposit and invest those moneys as required by statute and according to the fiduciary duty owed to the Osage Tribe." *Osage II,* 72 Fed.Cl. at 631. Plaintiff claims that the government breached these duties over two separate time periods: fiscal years 1973 to 1992 for all deposit-lag, excessive-cash-balance and investment-yield claims, and July 1974 through December 2000 for all Oil–Royalty Under–Collection claims. Pl.'s Mot. 1.

To facilitate consideration of the very large amount of historical accounting data related to the government's execution of its trust duties through the Bureau of Indian Affairs and the Osage Agency during these years, the court and parties defined five exemplary "Tranche One trial months," January 1976, May 1979, November 1980, February 1986, and July 1989, Order of Apr. 15, 2005, and four "Tranche One trial leases," the oil and gas leases known as the East Hardy Unit, the North Burbank Unit, the North Avant Unit and the Osage Hominy Unit. *Osage II,* 72 Fed.Cl. at 631 n. 2. "The point of a trial on specific leases for specific months [was] to provide the parties an opportunity to focus on discovery and factual presentation in a manageable format." *Osage Tribe of Indians of Okla. v. United States (Osage III),* 75 Fed.Cl. 462, 474 (2007).[3]

In late March and early April, 2006, the court held a ten-day trial focusing on the Tranche One trial months and leases. The court issued its Tranche One trial opinion, *Osage II,* on September 21, 2006, pursuant to Rule of the United States Court of Federal Claims (RCFC) 54(b). The court held that the Osage Tribe is entitled to compensation for five breaches of the government's fiducia-

ry duties as trustee: (1) Failure to Collect Royalties Based on Highest Offered Prices; (2) Failure to Collect Full Royalties During Price Controls; (3) Failure Promptly to Deposit Funds Because of Unreasonable Failure to Certify a Federal Depositary; (4) Failure to Maintain Appropriate Cash Balances; and, (5) Failure to Obtain Investment Yields in Accordance with Law. *Osage II,* 72 Fed.Cl. at 671. Based on this ruling, the court directed the parties to "brief the basis for the appropriate rate or rates to apply in determining the current value of the damages for which defendant has been found liable" and "whether, in lieu of or in addition to interest, plaintiff should be awarded late fees." *Id.*

On November 16, 2006, the parties submitted a Joint Submission on Calculation of Tranche One Damages (Joint Submission or Jt. Sub.). Jt. Sub. 1, Dkt. No. 251. While the parties represented that they agreed on some elements of the damages calculation, they disagreed on others. *Id.* The court then received briefs from each party explaining its position. *Osage III,* 75 Fed.Cl. at 467; [Corrected] Plaintiff Osage Nation's Brief in Support of Proposed Calculation of Tranche One Damages, Appropriate Rate of Interest to Apply in Determining the Current Value of Those Damages, and Entitlement to Late Fees, Dkt. No. 256; Defendant's Calculation and Supporting Brief about Damages Owed to Plaintiff Pursuant to Court's September 21, 2006 Opinion and Order, Dkt. No. 257.

On February 15, 2007, the court issued an opinion evaluating the numerous disagreements between the parties regarding the proper methodology to be applied in calculating the Tribe's damages for the Tranche One trial months and leases. *See generally, Osage III,* 75 Fed.Cl. at 469–482. The parties' disagreements included, inter alia, the proper royalty rate to be applied to a portion of the East Hardy Unit lease, what data could be relied upon to establish the highest offered

---

**3.** Both parties supported the use of the Tranche One months and leases as exemplary of the issues in dispute in the time periods represented. *See* Pre-trial Conference Transcript (PreTrial Conf. Tr.) of February 16–17, 2006, 350:4–8 (Mr. LaLonde, defendant's counsel) ("We're agreeable

to taking [out] that one month on that one lease. Because we think most if not all of the legal issues really still are there."), 15–19 (Mr. Pilsk, plaintiff's counsel) ("We, too, agree that enough of the critical legal issues are still in the case to provide a reasonable exemplar going forward.").

prices in certain circumstances, the proper calculation of deposit lag times, and the proper instrument to be used to calculate long-term investment yields. *Id.* After ruling on each disagreement and holding that the Tribe is not entitled to certain late fees, the court directed the parties to file their damages calculations in accordance with its opinion by Thursday, March 15, 2007. *Id.* at 483.

Further to the parties' second Joint Submission on Tranche One Damages filed on March 15, 2007 (second Joint Submission or 2d Jt. Sub.), 2d Jt. Sub. 1, Dkt. No. 268, the court entered judgment for the Tribe in the amount of $1,876,878.30. Judgment of Mar. 16, 2007, Dkt. No. 270. This amount consists of the damages owed to the Tribe with respect to the five Tranche One trial months (January 1976, May 1979, November 1980, February 1986, and July 1989) at the four Tranche One trial leases (East Hardy Unit, North Burbank Unit, North Avant Unit and Osage Hominy Unit).

On May 11, 2007, the United States filed its notice of appeal of the court's trial decision. *See* Notice of Appeal, Dkt. No. 272. However, after filing its appeal with the Court of Appeals for the Federal Circuit, the government-after receiving 88 days of extensions of time within which to file its brief as appellant, *see* Fed. Cir. Dkt. No. 13 (June 29, 2007) (motion for an extension of time); Fed. Cir. Dkt. No. 15 (Aug. 30, 2007) (motion for a second extension of time); Fed. Cir. Dkt. No. 17 (Oct. 9, 2007) (motion to dismiss the appeal for lack of jurisdiction)-filed a brief opposing the consideration of the case by the Federal Circuit on the grounds that "the [Court of Federal Claims] did not finally adjudicate any separate claims for relief and . . . abused its discretion in determining that there was no just reason for delay," Motion of the Appellant United States to Dismiss the Appeal for Lack of Appellate Jurisdiction 1, *Osage Tribe of Indians of Okla. v. United States,* 263 Fed.Appx. 43 (Fed.Cir.). In support of its opposition, the government asserted that the court's damages determination

left "dozens and dozens of virtually identical royalty payments unadjudicated that could be the subject of successive piecemeal appeals." *Osage Tribe of Indians of Okla. v. United States,* 263 Fed.Appx. 43, 44 (Fed.Cir. 2008) (unpublished table decision). On January 9, 2008, the Federal Circuit issued an order returning the case to the trial court, ruling that the Tranche One trial judgment could not be certified as a final judgment for immediate appeal. *Id.* at 45.

Fact discovery commenced on May 19, 2008 for all issues related to the application of the Tranche One trial damage calculation methodology to the broader Tranche One time periods: (1) July 1974 through December 2000 for all oil-royalty under-collection claims, and (2) fiscal years 1973 to 1992 for all deposit-lag, excessive-cash-balance and investment-yield claims.[4] Order of May 19, 2008, Dkt. No. 300. Discovery closed on November 18, 2008, Order of Aug. 21, 2008, Dkt. No. 319, and plaintiff filed the motion for summary judgment now before the court. Pl.'s Mot. 1.

The court is dismayed by defendant's approach to the resolution of plaintiff's claims. The government's basic position is that—despite the years of litigation between the parties and the jurisprudence established by this court—the Tribe's summary judgment motion is inappropriate and that

> a full trial is needed [because p]laintiff must establish both liability and damages before it can obtain any judgment. . . . [N]o determination of liability has yet been found on these claims (outside of the specific Tranche One [trial] months for the specific Tranche One [trial] leases), nor could such a determination be made on [p]laintiff's pending [motion for partial summary judgment].

Defendant's Statement Regarding the Discovery Period Prior to Trial (defendant's Statement or Def.'s Stmnt.) 2, Dkt. No. 497 (internal quotation marks omitted).

---

4. The court notes that at some point during this litigation, the government began referring to this broader time period as "Tranche 1.5." *See, e.g.,* Defendant's Motion for a Protective Order, Feb. 6, 2009, 2, Dkt. No. 351. The court refers to fiscal years 1973 to 1992 for all deposit-lag, excessive-cash-balance and investment-yield claims, and July 1974 through December 2000 for all oil-royalty under-collection claims, as the "broader Tranche One time periods."

The court held a status conference on May 16, 2008, expressly to discuss how to expand the Tranche One trial rulings in *Osage III* to the broader time periods encompassed by plaintiff's Tranche One claims. As the court stated, at issue was "a proposal by the [p]laintiff to really use a very expedited mechanism to take advantage of the law of the case aspects . . . and go ahead and try to succeed in closing out the [19]73 to [19]92 period on deposit lag and . . . and the [19]74 to 2000 undercollection." May 16, 2008 Status Conference Transcript (Status Conf. Tr.) 19, Dkt. No. 305. In its response to plaintiff's proposal, Ms. Maureen Rudolph, counsel for the government, stated that defendant agreed "factually in terms of how our experts have been working together and the time[ ]frames for which they have been working together." *Id.* at 26–27. The government suggests that summary judgment is inappropriate because a "determination of liability has [not] yet been found" beyond the Tranche One trial months and leases. Def.'s Stmnt. 2. The Court disagrees. The existence of the government's breach is the law of the case, and the purpose of this summary judgment action is to apply that law-to the extent it is legally appropriate to do so—to the broader Tranche One time periods, using the Tranche One trial months and leases as representative examples of the application of the law to each regulatory time frame at issue.

It is the court's expectation that, in light of the following Opinion and Order, the government will assist the court in the prompt resolution of the Tribe's Tranche One claims, avoid the repetition of strategies that appear calculated to result in delays,[5] and work in a cooperative manner in the second phase of this litigation in Tranche Two.[6]

## II. Legal Standards

▮▮ Plaintiff has moved for summary judgment pursuant to RCFC 56. Pl.'s Mot. 1. A motion for summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." RCFC 56(c)(1).[7] A fact is material if it might significantly affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the moving party has not

5. *See, e.g.*, Plaintiff Osage Nation's Reply Brief in Support of Its Amended Motion for Summary Judgment on All Oil–Royalty Under–Collection Claims for July 1974 to December 2000 and All Deposit–Lag, Excessive–Cash–Balance, and Investment–Yield Claims for Accounts 7386 and 7886 for United States Fiscal Years 1973 to 1992 (Pl.'s Reply or plaintiff's Reply) 9–10, Dkt. No. 428 ("The Osage Nation was left to its own to address [the] gap in the trust records. Mr. Martin and the United States deliberately decided not to attempt to obtain such data [to supplement missing records in the Joint Data Base] and have challenged at every juncture the Osage Nation's efforts to fill the gap left by the trustee's breach."); Osage Nation's Opposition to Motion for Protective Order and Cross–Motion to Compel Discovery, Feb. 13, 2009, 2–3, Dkt. No. 357 (cataloguing the government's incomplete and delayed responses to plaintiff's June 2008 discovery requests); February 12, 2010 Status Conf. Tr. 6:2–8:1, Dkt. No. 482 (discussing the parties' negotiation of a stipulation regarding ¶ 51(a) of the June 24, 2009 report of government expert Ronnie A. Martin, culminating with the government's withdrawal from negotiation on the day the stipulation was due because counsel was not authorized to enter into the stipulation).

6. Discovery and litigation regarding Tranche Two claims are proceeding separately. Discovery on Tranche Two issues closed on December

22, 2009, Order of October 2, 2009, Dkt. No. 433, and a trial has not yet been scheduled.

7. The Rules of the United States Court of Federal Claims (RCFC) were recently amended; the amended RCFC became effective on January 11, 2010. No changes to the RCFC affect the analysis or outcome of the matters addressed in this Opinion and Order.

The RCFC generally mirror the Federal Rules of Civil Procedure (FRCP). RCFC 56 Rules Committee Notes 2002 Revision ("The subdivision structure of RCFC 56 was reordered to more closely conform to FRCP 56."); *see Flowers v. United States*, 75 Fed.Cl. 615, 624 (2007) ("RCFC 56 is patterned on Rule 56 of the [FRCP] and is similar in language and effect."); *Champagne v. United States*, 35 Fed.Cl. 198, 205 n. 5 (1996) ("In general, the rules of this court are closely patterned on the [FRCP]. Therefore, precedent under the [FRCP] is relevant to interpreting the rules of this court, including Rule 56."); *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1541 n. 2 (Fed.Cir.1993) ("The [RCFC] generally follow the [FRCP]. [RCFC] 56(c) is, in pertinent part, identical to [FRCP] 56(c)."). Therefore, the court relies on cases interpreting FRCP 56 as well as those interpreting RCFC 56.

disputed any facts contained in the non-movant's pleadings, the court assumes all well-pleaded facts to be true and draws all applicable presumptions and inferences therefrom in favor of the non-moving party. *See Univ. of W. Va., Bd. of Trs. v. VanVoorhies,* 278 F.3d 1288, 1295 (Fed.Cir.2002); *Banks v. United States,* 69 Fed.Cl. 206, 209 (2006).

Failure by a non-moving party to raise a genuine issue of material fact may result in the court granting summary judgment in favor of the moving party. *See* RCFC 56(c)(1). "The party opposing the motion must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient." *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1116 (Fed.Cir.1985) (citing *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 836 (Fed.Cir. 1984)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis removed).

The application of the legal standard for summary judgment, however, must take into account the law governing the claim before the court. In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court held: "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 247, 106 S.Ct. 2505. By way of explanation, the Court stated that, "in ruling on a motion for summary judgment, the judge must view evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254, 106 S.Ct. 2505. For example, "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment . . . based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.*

at 252, 106 S.Ct. 2505. In contrast, in "consideration of a motion for acquittal in a criminal case, where the beyond-a-reasonable-doubt standard applies . . . the trial judge asks whether a reasonable jury could find guilt beyond a reasonable doubt. . . . Similarly, where the First Amendment mandates a 'clear and convincing' standard, the trial judge . . . should consider whether a reasonable factfinder could conclude, for example, that the plaintiff had shown actual malice with convincing clarity." *Id.* (citing *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

The law of this case is that defendant breached its fiduciary duties as trustee for the Osage Tribe by mismanaging both its royalty collection and its investment responsibilities; the proper discharge of those dual responsibilities required that the government as trustee keep and generate the very records upon which plaintiff would now need to rely to meet its summary judgment burden of proof as movant. In particular, because it is undisputed that the government failed to keep complete trust records for the Osage Tribe, the court finds that it now would be improper to require plaintiff to resolve all possible doubts about the facts the trustee failed to collect and maintain in the form of trust records in order to succeed in its motion for summary judgment. In the absence of accurate Osage Agency historical royalty and trust records, "[t]he Osage Tribe is entitled to damages *reasonably estimated* based on existing information. Especially where, as here, proper trust records are missing, doubts about calculations should be 'resolved against the trustee.'" *Osage II,* 72 Fed.Cl. at 670–71 (emphasis added) (quoting *Confederated Tribes of Warm Springs Reservation v. United States (Warm Springs),* 248 F.3d 1365, 1373 (Fed.Cir.2001) and citing William F. Fratcher, Scott on Trusts § 172 (4th ed.1987)). It is through this prism that plaintiff's claims must be viewed.

Contrary to the government's assertion that "conflicting allegations of experts may result in factual disputes" such that summary judgment is inappropriate in this matter, Defendant's Response to Plaintiff's Amended Motion for Partial Summary Judgment (de-

fendant's Response or Def.'s Resp.) 3, Dkt. No. 420, pursuant to the reasoning of *Anderson,* defendant's burden is not simply to question plaintiff's damages calculation methodologies. Accordingly, defendant must support its argument that plaintiff's claimed damages have been unreasonably estimated by using competent evidence to support an alternative calculation of damages, rather than, for example, offering hypothetical alternative explanations for the application of missing data or making unsubstantiated allegations of error.

## III. Discussion

### A. It Is Appropriate to Calculate Damages Owed to the Tribe on Summary Judgment

Plaintiff's Motion asks the court to apply the holdings of *Osage II* related to the five Tranche One trial months to the longer time periods relevant to plaintiff's Tranche One claims: (1) July 1974 through December 2000 for all oil-royalty under-collection claims, and (2) fiscal years 1973 to 1992 for all deposit-lag, excessive-cash-balance and investment-yield claims. The Tribe asserts that summary judgment is appropriate in the circumstances of the case, given that "five distinct breaches of trust [were] found by the [c]ourt in its liability opinion." Pl.'s Mot. 3.

The first two government breaches relate to the government's duty to collect oil royalties on behalf of the Osage Tribe in accordance with the regulations incorporated into all Osage oil leases. These regulations establish that royalties "may be expressed by the formula: Royalty Due=Royalty Rate × Volume × Royalty Value." *Osage II,* 72 Fed.Cl. at 636. The royalty rate is the fraction of oil produced at a given lease due to the Tribe as royalty; the volume is the gross number of barrels produced; and the royalty value is the dollar amount (calculated pursuant to the regulation) at which a royalty barrel is valued. During the Tranche One trial months, the specific regulation that governed this calculation was the 1974 version of 25 C.F.R. § 183.11(a)(2) (1974 Regulations), which provided that a royalty was to be based on "the actual selling price, or the highest posted or offered price by a major

purchaser in the Kansas–Oklahoma area whichever is higher on the day of sale or removal" of the oil at a given lease. *Osage II,* 72 Fed.Cl. at 638 (emphasis removed) (quoting 25 C.F.R. § 183.11(a)(2)). The court in *Osage II* held that the government committed two breaches of its duty to collect royalties for the Tribe: first, by failing to collect royalties based on the highest offered prices, and second, by incorrectly applying the royalty value formula under 25 C.F.R. § 226.11 to the maximum legal price-that is, to the highest rent-controlled price-for the first three of the five Tranche One trial months, rather than to the "actual selling price . . ., or the highest posted or offered price by a major purchaser in the Kansas–Oklahoma area." Pl.'s Mot. 4 (internal quotation marks omitted). In light of these breaches, the court awarded the Tribe damages in an amount equal to the difference between the minimum royalty that should have been paid to the Tribe pursuant to the regulations and the amount actually paid to the Tribe. *See Osage III,* 75 Fed.Cl. at 469, 483.

The other three government breaches relate to the government's duty prudently to invest the Tribe's oil royalty proceeds. As to the five Tranche One trial months—based on the 1906 Act, the applicable regulations and government policies—the *Osage II* court found the government liable for (1) failing to deposit royalty funds in an interest-bearing account within one business day of receipt (deposit lag), (2) failing to keep a maximum of $25,000 on hand as uninvested cash in violation of its own policies (underinvestment) and (3) failing to achieve the investment returns that its own standard of prudence and statutory mandates required (investment underperformance). *Osage III,* 75 Fed.Cl. at 466. For the deposit lag breach, the court awarded the Tribe damages equal to the amount of additional interest that would have been earned in the trust account if the United States had deposited all royalties timely, within one day of receipt, as directed by its own policy objective. *Osage II,* 72 Fed.Cl. at 664–65. For the underinvestment and investment underperformance breaches, the court directed the gov-

ernment to pay damages in the amount of the difference between the actual investment earnings and "the expected return of a combination of 3-month CD rates (80%) and 3-month T-bill rates (20%) on average daily balances in excess of $25,000." *Osage III,* 75 Fed.Cl. at 466.

According to plaintiff, there can be no dispute that the systematic undercollection of royalties and mismanagement of proceeds that the *Osage II* court found in the Tranche One trial months also characterize the activities of the government during the entire period that the 1974 Regulations were in place-from July 22, 1974 to August 13, 1990, *Osage II,* 72 Fed.Cl. at 638-as well as from August 14, 1990, until December 2000, when a modified, narrower version of the 1974 Regulations controlled. Pl.'s Mot. 6. As established in the Tranche One trial, in administering its trust duties owed to the Osage Tribe, the United States failed to " 'properly [ ] construe the legal framework that sets out its trust duties . . . and to interpret accurately its trust duties," Plaintiff Osage Nation's Reply Brief in Support of Its Amended Motion for Summary Judgment on All Oil-Royalty Under-Collection Claims for July 1974 to December 2000 and All Deposit-Lag, Excessive-Cash-Balance, and Investment-Yield Claims for Accounts 7386 and 7886 for United States Fiscal Years 1973 to 1992 (plaintiff's Reply or Pl.'s Reply) 3, Dkt. No. 428 (quoting *Osage II,* 72 Fed.Cl. at 643). Because that failure resulted in a loss of revenue to the Tribe, the court deemed the government's failure " 'a breach of defendant's trust duties.' " *Id.* Plaintiff argues that the law of the case is that the Tribe " 'is *entitled* to have its royalties calculated, as nearly as may *now* be reasonably determined, in accordance with the requirements of the 1974

Regulations.' " *Id.* (quoting *Osage II,* 72 Fed.Cl. at 654). For these reasons, plaintiff contends that the royalty undercollection issue is properly before the court on its motion for summary judgment.

Plaintiff argues that there is no genuine dispute that the United States failed to collect all royalties legally due to the Tribe because the failure was admitted by defendant's expert Mr. Ronnie Martin in his deposition.[8] Plaintiff Osage Nation's Reply Brief in Support of its Amended Motion for Summary Judgment on All Oil-Royalty Under-Collection Claims for July 1974 to December 2000 and All Deposit-Lag, Excessive-Cash-Balance, and Investment-Yield Claims for Accounts 7386 and 7886 for United States Fiscal Years 1973 to 1992 (plaintiff's Reply or Pl.'s Reply) 4, Dkt. No. 428 (citing Pl.'s Reply, Exh. 17, Martin Transcript (Martin Tr.) 38:3-39:3). Plaintiff's position is that the parties should be able to apply the court's Tranche One trial holdings in a straightforward way to calculate the damages owed the Tribe for the time periods at issue between July 1974 and December 2000, Pl.'s Mot. 6, exclusive of the damages already awarded for the Tranche One trial months.

Defendant disagrees with plaintiff's reasoning and proposed method of calculating royalty damages for the Tribe's undercollection and investment claims. The United States argues that "even assuming that the United States was under a duty to calculate royalties based on such 'offered prices,' that duty cannot encompass an obligation to guarantee that the Tribe received such deposits, especially given the difficulties already acknowledged by the Court in obtaining the information necessary to do so." Def.'s Resp. 5 (citing *Osage [II],*[9] 72 Fed.Cl. at 653-

---

8. Mr. Ronnie Martin was qualified by the court in the Tranche One trial as defendant's "expert in oil . . ., oil royalty calculation, the verification of oil royalty paid, and oil royalty practices." *Osage II,* 72 Fed.Cl. at 635 n. 8 (internal quotation marks omitted). The Expert Report of Ronnie A. Martin (Martin Rpt.) was submitted to the court as Exhibit A to Defendant's Response to Plaintiff's Amended Motion for Partial Summary Judgment (defendant's Response or Def.'s Resp.). Def.'s Resp., Exh. A, Martin Rpt., Dkt. No. 420.

9. At some point during the extensive briefing in this case, defendant began referring to *Osage Tribe of Indians of Oklahoma v. United States,* 72 Fed.Cl. 629 (2006), as *"Osage III "* and *Osage Tribe of Indians of Oklahoma v. United States,* 75 Fed.Cl. 462 (2007), as *"Osage IV ".* The court notes that in this opinion it maintains the naming conventions used in its previous opinions: *Osage Tribe of Indians of Oklahoma v. United States,* 68 Fed.Cl. 322 (2005), is *"Osage I ";* *Osage Tribe of Indians of Oklahoma v. United States,* 72 Fed.Cl. 629 (2006), is *"Osage II ";* and, *Osage Tribe of Indians of Oklahoma v. United States,* 75 Fed.Cl.

54). Defendant therefore believes that the damages calculation proposed by the Tribe is not suitable for summary judgment. In the view of the United States, there is a factual issue precluding this court from extrapolating its liability holdings from the Tranche One trial to the broader Tranche One time periods at issue in plaintiff's summary judgment motion now before the court: "None of the [c]ourt's prior rulings ... have established the precise limits of the scope of [the] fiduciary duty" that the United States has breached. Def.'s Resp. 6. According to the United States, it was required only to "take 'all appropriate measures' to administer its trust duties to the Osage Tribe," Def.'s Resp. 5 (quoting *Osage [II]*, 72 Fed.Cl. at 642), and that the United States cannot now be held liable for its "mere errors of judgment, when acting honestly with ordinary prudence within the limits of the trust." *Id.* (citing *Navajo Tribe of Indians v. United States*, 9 Cl.Ct. 336, 400 (1986)).

In the government's view, this court has endorsed a test based on whether the Osage Agency's actions were "reasonably calculated to result in compliance with the regulations as they were understood by the Osage Agency." Def.'s Resp. 8. For support, defendant relies on numerous isolated phrases used by the court in its opinions in *Osage II* and *Osage III*, such as the following: "[W]here defendant, in discharging its responsibilities properly construed, put in place procedures to carry out those responsibilities, the court evaluates whether the procedures were reasonably calculated to result in compliance." Def.'s Resp. 7 (quoting *Osage [II]*, 72 Fed.Cl. at 643); *see also* Def.'s Resp. 8–9 (citing, inter alia, *Osage [II]*, 72 Fed.Cl. at 646–47 (noting the court's discussion of the application of a higher offered price where such a "bonus offer was known to the Osage Agency"); *id.* at 652 (noting that the court observed that the regulations "impose heavy sanctions should either [the purchaser or the lessee] fail to make the proper royalty payment to the Osage Agency," and that the system is structured such that the relative "risk" and "benefit" to those parties provides

"incentives for compliance" that are "reasonably calculated to result in compliance with" the regulations); *id.* at 654–55 (noting that the court rejected the Tribe's claim regarding insufficient staffing at the Osage Agency)).

As a result, the government asserts that a trial is required to determine the difference between the damages the Tribe has sustained *"as defined by* the difference between what could or would have happened under procedures reasonably calculated to result in compliance with the regulations as interpreted by the [c]ourt, and what did in fact happen." Def.'s Resp. 9–10. The government argues that a trial is required to determine "the facts that existed at the time of the occurrence" of the breaches. Def.'s Resp. 8. Defendant argues that a trial is required, not only to determine the amount of royalty undercollection damages due to the Tribe, but also because "evidence will have to be offered from which a determination can be made as to which investments would have been made by a reasonably prudent trustee in the course of discharging his fiduciary obligations." *Id.* (internal quotation marks omitted).

Defendant's final argument is that the Tribe's position would inappropriately place the United States in a role as the Tribe's guarantor. Def.'s Resp. 10. The government asserts that it is unreasonable for plaintiff to assume that even if the government had properly applied and enforced the court's interpretation of the "offered price" regulations, there is no guarantee that the Tribe would have received the "maximum payments" sought by plaintiff. *Id.*

■ The court disagrees with defendant's view of the law of the case. In *Osage II*, the court held that "[d]efendant has the responsibility properly to construe the legal framework that sets out its trust duties. Defendant's failure to interpret accurately its trust duties, when such failure results in a loss of revenue to the Osage Tribe, is deemed a breach of defendant's trust duties." *Osage*

462 (2007), is *"Osage III."* Accordingly, rather than inserting "[sic]" to note defendant's different numbering, the court has simply revised de-

fendant's citations and placed the revised numbering in brackets.

*II*, 72 Fed.Cl. at 643. The government now interprets this language to mean that even if the U.S. misinterpreted its own regulations, as long as there was no other malfeasance, the measure of damages should be tied to "procedures reasonably calculated to result in compliance with the regulation as interpreted by the [c]ourt." Def.'s Resp. 9–10. Defendant's contention is inconsistent with the court's prior opinions and in derogation of defendant's own duties as trustee.

The government is conjuring a new defense of so-called "good faith" in an attempt to reduce the amount of royalties it owes to the Tribe as a result of its failure to fulfill its fiduciary responsibilities between 1972 and 2000. *See, e.g.,* Def.'s Resp. 5 ("[A] trustee is not liable for mistakes or mere errors of judgment, when acting honestly with ordinary prudence within the limits of the trust."); *id.* at 23 ("[T]he Tribe has produced no evidence that the Osage Agency's decision to apply price controls in calculating royalty payments resulted in anything other than (at most) a good faith error in judgment."). The cases cited by the government to support its theory-that the duty of a trustee must be based in reality at the time, and not in "prescience" or any heightened standard-are factually distinguishable, for the reason that they deal with situations in which money or property already under the control of a trustee was then mismanaged. *See* Def.'s Resp. 5–6 (citing three cases: *Navajo Tribe of Indians,* 9 Cl.Ct. 336, 400 (adjudicating the government's alleged breach of its duty to manage Tribe-owned timberland); *Stark v. United States Trust Co. of New York,* 445 F.Supp. 670, 678–79 (S.D.N.Y.1978) (involving a beneficiary who sued a trustee to recover losses incurred allegedly as the result of the trustee's lack of prudent management); and *United States v. Mason,* 412 U.S. 391, 398, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973) (holding in a suit brought by an individual Osage Indian challenging the government's payment of estate tax that "if . . . trust property is lost or destroyed or diminished in value, the trustee is not subject to a surcharge unless he failed to exercise the required care and skill")).

In plaintiff's royalty undercollection claims, the issue is not that the government mismanaged royalty funds held on behalf of the Tribe, but that the government failed in its duty to collect the royalties owed in the first place. How the government would have managed that money is completely hypothetical. In such a circumstance, the court's role is to establish the regulatory requirements the Osage Agency should have met—in both collecting and investing such royalties—and to hold the government responsible for its failure to meet its fiduciary duties as a matter of law. The United States is not entitled now to ask the court to hold a trial to determine what *might* have happened if the Osage Agency had properly collected the royalties due to the Tribe. The court agrees with plaintiff's contention: "Because failure to collect the royalties required by law is undisputed in each of the periods where damages are sought, the Osage Nation need only prove damages 'reasonably estimated based on existing information.'" Pl.'s Reply 5 (quoting *Osage III,* 75 Fed.Cl. at 475).

Another inference that is suggested by the government's position is that the court should consider whether, if the Agency had collected the Tribe's royalties, it might have invested the money in a reasonable way that would have earned the Tribe proceeds in an amount less than the damages the Tribe is now requesting, because different investment choices would have been reasonable at the time. This reasoning leads the government to argue that the damages being sought by the Tribe should be reduced. However, as already established by this court, the government is not entitled to this, or any, inferences in its favor, because the Osage Agency's trust records are indisputably inadequate, and the Osage Agency indisputably failed to collect the royalties due to the Tribe pursuant to the 1906 Act and the applicable regulations and policies. Even if there were doubts about the impact of the government's failure, "doubts should be resolved against the trustee when proper trust records are missing." *Osage III,* 75 Fed.Cl. at 475 (citing *Warm Springs,* 248 F.3d at 1373). Here, as to plaintiff's royalty undercollection claims, there are no doubts. The government may not reduce the amount of damages owed the

Tribe by arguing hypothetical investment return rates that may have been earned had the royalties been collected and invested. To allow the government to reduce its damages by relying on a hypothetical performance of duties it in fact failed to perform would run afoul of the standard established by *Warm Springs*.

For the foregoing reasons, the court finds that, in the absence of any specific factual disputes related to the calculation of a particular component of the Tribe's damages, it is appropriate to apply the liability holdings of *Osage II* and *Osage III* to the broader time periods for which plaintiff claims damages in its summary judgment motion presently before the court.

### 1. Damages for Specific Undercollection Breaches from July 1974 to December 2000

Because the United States failed to collect contemporaneous data for the posted and offered prices that were to be used as standards to set prices pursuant the regulations that governed royalty amounts owed to the Tribe, plaintiff relied on its expert, Mr. Daniel Reineke,[10] to use existing data to approximate the proper calculation of royalties owed. *See generally,* Pl.'s Mot. 8–14; Osage Nation's Unopposed Motion to Amend its Motion for Summary Judgment, Exh. 2, Declaration and Expert Report of Daniel T. Reineke, P.E. (Reineke Rpt.), Dkt. No. 397. Plaintiff argues, and the court agrees, that where, as here, "proper trust records" are missing, doubts related to the historical price data must be resolved in favor of the Tribe. Pl.'s Reply 5 (quoting *Osage III*, 75 Fed.Cl. at 475 (citing *Warm Springs*, 248 F.3d at 1373)). Plaintiff further explains that it is therefore the burden of the United States to "point to specific facts from which a trier of fact could reasonably infer that the beneficia-

ry's estimate is unreasonable." Pl.'s Reply 5. The court agrees; plaintiff is required only to prove damages "reasonably estimated based on existing information." *Osage II*, 72 Fed.Cl. at 670. As this court held in *Osage I*, "the statutes and regulations at issue here clearly establish a fiduciary duty to verify that lessees fulfill their contractual obligations to the Tribe by verifying the accuracy of payments made." *Osage I*, 68 Fed.Cl. at 333. Plaintiff has accurately framed the inquiry: "Determining whether the United States has complied with this duty involves comparing the royalties the United States actually collected with the royalties due under the regulations, consistent with the construction of those regulations in the [c]ourt's Tranche One [trial] decisions." Pl.'s Mot. 8.

There are four distinct time periods at issue between July 1974 and December 2000, during which the regulatory requirements for determining Osage oil royalties were slightly different, therefore requiring slightly different calculations to determine the damages owed to the Tribe. The four periods are: (1) July 1974 to December 1980, when the 1974 Regulations defined royalty value based on the actual selling price or highest posted or offered price by a major oil purchaser in the Kansas–Oklahoma area (overlapping a period of government-imposed price controls); (2) January 1981 to August 13, 1990, when the 1974 Regulations defined royalty value based on the actual selling price or highest posted or offered price by a major oil purchaser in the Kansas–Oklahoma area; (3) August 14, 1990 to May 1994, when the 1990 Regulations defined royalty value based on the highest posted or offered price by a major oil purchaser in Osage County; and, (4) May 1994 to December 2000, when the 1994 Regulations defined royalty value based on the highest posted price by a purchaser in Osage County.

---

**10.** Mr. Daniel Reineke was qualified by the court as plaintiff's expert on "oil royalty calculation and verification of royalty due." *Osage II*, 72 Fed.Cl. at 635 n. 8 (internal quotation marks omitted) (providing information on the bases for Mr. Reineke's qualification as an expert). The Declaration and Expert Report of Daniel T. Reineke, P.E. (Reineke Rpt.) was submitted to the court on May 1, 2009 to support plaintiff's Unopposed Motion to Amend its Motion for Summary

Judgment, Dkt. No. 397, and later cross-referenced as Exhibit 2 to Plaintiff Osage Nation's Amended Motion for Summary Judgment on All Oil–Royalty Under–Collection Claims for July 1974 to December 2000 and All Deposit–Lag, Excessive–Cash–Balance, and Investment–Yield Claims for Accounts 7386 and 7886 for United States Fiscal Years 1973 to 1992 (plaintiff's Motion or Pl.'s Mot.), Dkt. No. 407. Reineke Rpt.

### a. The "Price Control" Breach: July 1974 to December 1980

During a portion of the time period when the 1974 Regulations governed, covering approximately six and one-half years, prices for crude oil were subject to price and allocation controls. *Osage III*, 75 Fed.Cl. at 465–66 (citing the Emergency Petroleum Allocation Act of 1973 (EPAA), Pub.L. No. 93–159, 87 Stat. 627 (1973) (codified at 15 U.S.C. §§ 751–760(h)), *repealed by* Pub.L. No. 94–163, tit. IV § 461 (Dec. 22, 1975)). Mandatory petroleum regulations that became effective in December 1973 applied to "all producers, refiners, and others who purchase crude oil from producers directly or indirectly for resale or transfer to refineries." *Osage II*, 72 Fed.Cl. at 659 (citing 10 C.F.R. at § 211.61 (1975)). The government also promulgated mandatory petroleum price regulations that applied to "each sale, lease or purchase of a covered product in the United States." *Id.* (citing 10 C.F.R. § 212.2). "Oil from stripper well leases, which represented 'probably a majority' of the production at the Osage Reservation, was exempt from price controls under § 4(e)(2) of the EPAA." *Id.* (internal citation omitted).

For the three Tranche One trial months that fell within the time period when price controls were in effect—January 1976, May 1979 and November 1980—the court found that, in addition to the "offered price" breach, the Osage Agency had misapplied price controls to its calculation of royalties owed to the Tribe. *Osage II*, 72 Fed.Cl. at 661 (holding that price controls "did not extend to the calculation of royalty owed to the Osage Tribe under the 1974 Regulations"). The court rejected the United States' position that it was reasonable for the Osage Agency to have applied price controls to its royalty calculations because "[the Department of] Interior did not have the authority to decide whether or not royalty interests were subject to the price controls imposed under the Emergency Petroleum Allocation Act [EPAA]." *Osage II*, 72 Fed.Cl. at 660. The court also noted that the government did not recognize and apply price controls to leases in which it had an interest. *Id.* (citing *Pennzoil Exploration and Production Co. v. Lujan*, 928 F.2d 1139, 1140 (Em.App.1991), in which the Department of the Interior argued that Pennzoil must pay it royalties according to the predetermined royalty formula under the EPAA). The court found the government's argument here to be "one of convenience and inconsistent with the plain language of the [EPAA]." *Id.*

To compute royalty values in accordance with the law of the case, plaintiff's expert Mr. Reineke used production data from the Osage Agency[11] and the Joint Data Base (developed jointly by him and by defendant's expert, Mr. Martin) to identify the highest posted or offered price by a major purchaser in the Kansas–Oklahoma area on the date of sale or removal for each Osage oil purchase.[12] Mr. Reineke adjusted the highest posted or offered price to reflect the gravity of the royalty oil before calculating the royalty value. Reineke Rpt. 4.

The government does not appear to take issue with Mr. Reineke's damage calculations for the price-control period (except for the "Sun Oil" issue discussed below). However, the government raises two new legal challenges. First, the government argues that plaintiff has failed to show that the Osage Agency's "decision to apply price controls in calculating royalty payments resulted from anything other than (at most) a good faith error in judgment." Def.'s Resp. 23. For the reasons discussed above in Part III.A, defendant's "good faith" argument is unavailing. Second, the government argues that, in order to prevail on damages, plaintiff must demonstrate that the amount of damages it is

---

11. Although the Agency production data recorded only the month, and not the day, of each royalty sale or removal, it was industry practice in the 1970s to hold posted and offered prices constant through each calendar month. Pl.'s Mot. 10; Reineke Rpt. 8–9.

12. The parties agree that the Joint Data Base "consists of information that is reasonably cor-

rect . . . regarding oil production from the Osage mineral estate during the period from July 1974 to December 1980 and from January 1988 to December 2000." Plaintiff Osage Nation's Proposed Findings of Uncontroverted Fact 1–2, Dkt. No. 364; Defendant's Response to Plaintiff Osage Nation's Proposed Findings of Uncontroverted Fact 6, Dkt. No. 421.

claiming are certain and "not in any respect speculative or the result of other precipitating events." *Id.* at 24. According to the government, the higher royalty values that would have resulted if the Osage Agency had complied with the 1974 Regulations would have led "to financial hardship to producers, resulting in less production of oil on the Osage reservation, resulting in less revenue for the Osage Tribe." *Id.* at 25–26. According to defendant's expert Mr. Martin, "oil leases between the Tribe and lessees on the Osage reservation remained effective only as long as oil was being produced on the lease in 'paying quantities,' a term of art in the industry that means that revenues must exceed costs." *Id.* at 24–25 (citing Def.'s Resp., Exh. A, Expert Report of Ronnie A. Martin (Martin Rpt.) ¶ 37).

The government points to nothing that factually distinguishes the portion of the broader Tranche One time period when price controls were in effect—July 1974 to January 1981—from the three Tranche One trial months that fall within this time period. Following trial, the parties agreed on the correct volume of oil for which royalty was due in those three trial months, and the new argument of the government had no role in that calculation, despite the fact that the "paying quantities" requirement was contained in all four of the Tranche One trial leases at issue. *See* Martin Rpt. ¶ 37.

A third challenge made by the government that applies only to this time period is an allegation that Mr. Reineke improperly relied on data indicating that between July 1974 and January 1977, Sun Oil paid a $0.15 bonus per barrel of uncontrolled Osage oil purchased, thereby improperly increasing the highest offered price for that time period. Def.'s Resp. 21. However, this argument ignores the holding of the court in *Osage II* that "price controls on the sales of crude oil did not extend to the calculation of royalty owed to the Osage Tribe under the 1974 Regulations." *Osage II,* 72 Fed.Cl. at 661. Therefore the fact that the $0.15 bonus was valid only for purchases of uncontrolled oil is irrelevant to the royalty calculation. In fact, as the Tribe notes, this very bonus was expressly included when damages were computed for the January 1976 Tranche One trial month. Pl.'s Reply 8 (citing *Osage II,* 72 Fed.Cl. at 645–48); Pl.'s Reply, Exh. 2, Rebuttal Expert Report of Daniel T. Reineke, P.E. (Reineke Rebuttal) ¶¶ 14–15, Dkt. No. 428.

For the foregoing reasons, the court GRANTS IN PART plaintiff's motion for summary judgment regarding the "price control" breach from July 1974 to December 1980.

### b. The "Offered Price" Breach: January 1981 to August 13, 1990

Asserting that "conflicting allegations of experts may result in unresolved factual disputes," Def.'s Resp. 3, defendant attacks both the validity of the underlying data upon which plaintiff's expert bases his analysis and the methodology of that analysis in support of its contention that genuine issues of material fact are unresolved and that another trial in this matter is required. In particular, defendant challenges all of the Tribe's damages calculations related to the government's alleged failure to collect royalties due under the leases and regulations on a monthly basis, based upon the "highest offered price" pursuant to the 1974 Regulations.

At issue is plaintiff's reliance on a set of offered-price data that plaintiff obtained from Koch Industries, Inc. (Koch) by subpoena to supplement the inadequate data record assembled by the Osage Agency.[13] Plaintiff argues that the government's challenge to plaintiff's evidence does not rise to the level required to carry defendant's burden to create "an evidentiary conflict . . . on the record" such that trial is now required. Pl.'s Reply 9 (quoting *Grand Acadian, Inc. v. United States,* 87 Fed.Cl. 193, 197 (2009)). With respect to a large majority of the defendant's arguments, the court agrees with plaintiff's analysis, assuming, however, that the standard articulated in *Warm Springs* affects the standard of proof in a case in

---

13. For organizational convenience, within this Part III.A.i.b, the court presents the arguments in the order presented by plaintiff in its reply, because plaintiff addressed the issues raised both by Mr. Martin in his expert report, and by defendant in its response brief.

which a breach of trust has been found. As discussed above in Part II, the law of this case is that defendant breached its fiduciary duties as trustee for the Osage Tribe by mismanaging both its royalty collection and its investment responsibilities. Therefore it would be inappropriate now to require plaintiff to resolve all possible doubts raised by the government about the facts and data that the trustee failed to collect and maintain in the form of trust records. If the court finds that a finder of fact could "reasonably estimate" damages owed to the Tribe based on existing information, the plaintiff may prevail in its motion for summary judgment, especially "where, as here, proper trust records are missing, doubts about calculations should be 'resolved against [the trustee].'" *Osage II*, 72 Fed.Cl. at 670–71 (quoting *Warm Springs*, 248 F.3d at 1373). Under *Warm Springs*, defendant must prove that there are genuine issues of material fact in dispute regarding the reasonableness of plaintiff's calculations. In this case, the court finds that, in most instances, defendant simply states that it disagrees with plaintiff's analysis but does not demonstrate that there are factual issues in dispute.

However, against the possibility that this court has misperceived the interrelationship between the summary judgment standard of review and the guidance in *Warm Springs*, the court has identified those points at which defendant's arguments rise sufficiently close to raising an issue of fact that the court has decided to hold a trial. Accordingly, pursuant to RCFC 56(d), the court will here, "to the extent practicable, determine what material facts are not genuinely at issue." RCFC 56(d)(1).

i. The Reliability of the Koch Data

For the time period when the 1974 Regulations governed and price controls were no longer in effect, plaintiff's expert Mr. Rei-

neke performed calculations similar to those described in Part III.A.1.a above, but also relied on a set of offered-price data that plaintiff obtained from Koch Industries, Inc. (Koch) by subpoena. Koch was, at all relevant times, a major purchaser in the Kansas–Oklahoma area. Pl.'s Mot. 11. From January 1, 1981 through December 31, 1990, Koch recorded "the top 50 highest[-]priced leases for each day [ (Koch Top 50) ]." Plaintiff Osage Nation's Motion for Summary Judgment on All Oil–Royalty Undercollection Claims from July 1974 to December 2000 and All Deposit–Lag, Excessive–Cash–Balance, and Investment–Yield Claims for Accounts 7386 and 7886 for United States Fiscal Years 1973 to 1992, Exh. 3, Declaration of Vance Klager (Klager Decl.) ¶¶ 2, 8, Dkt. No. 338; Pl.'s Reply 10.[14] Plaintiff subpoenaed Koch to provide the top lease prices in Kansas and Oklahoma. *See* Pl.'s Mot. 9, 10; Klager Decl. ¶¶ 2, 8. Plaintiff argues that adding the Koch Top 50 data to the analysis is appropriate under the standard established by *Warm Springs* because the Joint Data Base does not include offered prices outside Osage County, nor does it include offered prices made in Osage County that did not result in sales. Pl.'s Reply 9.

Because the Joint Data Base indisputably contains incomplete production data from the Osage Agency for this time period, *see* Pl.'s Reply 9–10; Martin Tr. 21:17–25:18, Mr. Reineke relies on Koch's highest offered price data to fill some of the gaps. According to plaintiff, Mr. Reineke's methodology-to compare the highest posted or offered price from the Joint Data Base to the highest offered price by Koch, then base his royalty calculation on the highest price after adjusting for gravity-is an appropriate way for the beneficiary, the Tribe, to remedy the government failure as a fiduciary to keep proper records. In plaintiff's view, as a result of the government's repeated refusals to provide the Tribe with trust records related to offered prices

14. For all issues related to the Koch data, plaintiff relies on the declaration and deposition testimony of Vance Klager, an employee of Koch or one of its related companies since 1980 who is "familiar with Koch's crude oil accounting systems, including the pricing of crude oil and payments to interest holders for crude oil purchases made from their leases." Plaintiff Osage Na-

tion's Motion for Summary Judgment on All Oil–Royalty Under–Collection Claims for July 1974 to December 2000 and All Deposit–Lag, Excessive–Cash–Balance, and Investment–Yield Claims for Accounts 7386 and 7886 for United States Fiscal Years 1973 to 1992, Exh. 3, Declaration of Vance Klager (Klager Decl.) ¶ 1, Dkt. No. 338.

outside of Osage County and offers made in Osage County that did not result in sales of oil, the government has left the task of filling in the data gaps to the Tribe, which it has done by obtaining the Koch data. Pl.'s Reply 9–10. While this "is the United States' prerogative in litigation, ... the choice has consequences. It cannot leave the task to [the Tribe] and then be given the benefit of any doubt. Hence the rule of *Warm Springs* ...." *Id.*

In its response, based principally on the report of its expert Mr. Martin, the government attacks the validity and accuracy of the Koch data, pointing to a "variety of errors and unexplained discrepancies" to challenge the accuracy of the Koch database and suggest that a trial is required as a result. Def.'s Resp. 16. However, instead of briefing the specific instances where Mr. Martin has allegedly identified errors that make the Koch data unreliable, defendant relies entirely on Mr. Martin's expert report to support its contention that there are disputed issues of fact related to plaintiff's reliance on the Koch Top 50 data.[15] *Compare* Def.'s Resp. 17–18 *with* Martin Rpt. ¶ 51.a–I. What follows is a review of the substantive challenges to plaintiff's reliance on the Koch data made by defendant in its briefing.

First, the government argues that the Koch Top 50 data was generated "solely to respond to a subpoena issued by the Tribe," Def.'s Resp. 10, and is therefore not a reliable source of offered price data. According to the government, the data was "not maintained in the ordinary course of business," *id.*, and "may not even represent an offer" to buy crude oil. *Id.* at 11. According to plaintiff, however, the Top 50 lists are printouts of actual Koch data that the company relied on contemporaneously to create its purchase statements. Pl.'s Reply 10. In fact, Mr. Klager in his declaration directly contradicts defendant's allegation, stating that the Top 50 lists represent "the prices actually offered by Koch for purchases of crude oil." Klager Decl. ¶ 9. The prices may not have resulted

in sales on each day; however, by the terms of the 1974 Regulations that were in effect during this time period, the fact that the price was "offered" is all that matters. The court therefore finds that there is no genuine issue of material fact raised by this government challenge. The government has no factual basis on which to challenge Mr. Klager's declaration.

Second, the government argues that, because Koch was sometimes a party to exchange agreements instead of a direct purchaser of crude oil, its data cannot be relied upon to determine offered prices. In his expert report, Mr. Martin argues that, because a price must be paid "near the lease" to qualify as an offered or posted price, "[o]ver 89% of the crude oil agreements provided by Koch do not constitute evidence of 'offered prices' as defined by the [c]ourt." Martin Rpt. ¶ 51.a. The government implies that many of the Koch prices combined lease purchase prices with costs for transportation and handling, since it was not itself an oil refiner, and such prices are not "offered prices" under the 1974 Regulations. *See* Def.'s Resp. 13–14.

Defendant's argument is without legal support. There is nothing in the 1974 Regulations that specifies that only lease prices offered by oil refiners qualify to set royalty rates; prices offered or paid by companies involved in exchanges or reselling such as Koch were equally valid. The 1974 Regulations required only that the price be "offered," and did not specify by whom. Further, defendant's argument is directly contradicted on the facts by Mr. Klager, who stated unequivocally in his declaration that the Top 50 prices are "prices actually offered by Koch for purchases of crude oil." Klager Decl. ¶ 9. During his deposition, Mr. Klager further clarified the point that these were prices *at the lease* and therefore, by definition, did not include any services beyond the lease purchase:

---

**15.** In his expert report, Mr. Martin provides 19 separate points of disagreement with Mr. Reineke's analysis, including attacks specific to the Koch data and more generalized attacks relevant to plaintiff's "offered price" analysis, discussed

below. *See* Martin Rpt. Exh. C–1 (summarizing 19 points of disagreement); Pl.'s Reply, Exh. 2, Rebuttal Expert Report of Daniel T. Reineke, P.E. (Reineke Rebuttal) 1, Dkt. No. 428.

Q: Do the price codes used in generating the top 50 list all reflect prices paid at the lease, or do they reflect some other price in some other part of the process of distributing oil?

A: Those were lease prices.

Q: And how do you know that?

A: It just is. That is what they are. There's just no question about it. I don't know how to describe it differently.

Pl.'s Reply 14 (citing Exh. 16, Klager Transcript (Klager Tr.) 155:19–156:4). This point was acknowledged by both parties at the telephonic status conference (TSC) held by the court on March 8, 2010, when defendant's counsel stated that Mr. Martin had modified his earlier view that the prices in question included charges for services such as transportation and therefore must be disregarded. *See* Mar. 8, 2010 TSC Tr. 21:10–23:6, Dkt. No. 503.

Third, defendant suggests that Koch's oil-purchasing data is unreliable because it has "been determined to be false and misleading in federal court," citing *United States ex rel. Koch v. Koch Industries, Inc.*, No. 91–cv–763–K, 1999 U.S. Dist. LEXIS 16632 (N.D.Okla.1999). Def.'s Resp. 16 n. 11. In that case, the government and company shareholders alleged that Koch had submitted false information-understating the quantity of crude oil and natural gas produced from federal and Indian lands-in order to reduce the amount of royalties it would owe. *Koch Industries*, 57 F.Supp.2d at 1124. In the opinion cited by defendant, the Oklahoma district court ruled on a number of motions made by plaintiff seeking attorneys' fees and sanctions related to spoliation of evidence. Given the facts of that case, plaintiff rightfully counters that for defendant to take issue now with the Tribe's use of the Koch Top 50 lists on these grounds is illogical and counterfactual. Pl.'s Reply 11. If all Koch data is "false and misleading" in the way suggested by the lawsuit—that is, if the Koch data generally understates the volume of oil and gas obtained by Koch from federal and Indian leases—then the Koch Top 50 lists used here are more likely to provide an understatement of the government's royalty obligations, not an overstatement. The Oklahoma district court litigation suggests that plaintiff's use of the Koch data to fill the gaps left by the Osage Agency operates in defendant's favor.

Fourth, noting that Mr. Martin has identified a number of data "errors" in the Koch data set, the government argues that the Tribe's reliance on the data should defeat plaintiff's Motion by raising issues of fact that must be resolved at trial. Def.'s Resp. 16.[16] The Tribe's first response is that, in leveling his criticism of the Koch data, Mr. Martin looked at data points well beyond those that were eventually relied upon as top offered prices, and were therefore actually used in the Osage Tribe's damage calculations. In fact, Mr. Martin admits that he did not even try to discern which, if any, of the data errors he alleges would yield a reduction in the Tribe's damages claim. Pl.'s Reply 11; Martin Tr. 239:6–11. In contrast, plaintiff's expert, Mr. Reineke, considered each of the "errors" alleged by Mr. Martin, and concluded that only two of the adjustments suggested by defendant were appropriate: (1) because Mr. Martin determined that the data for one lease included in the Top 50 lists covered oil purchases in Utah rather than in the Kansas–Oklahoma area, Mr. Reineke removed that lease from his calculations, thereby changing the highest normalized price on 83 days, Martin Rpt. ¶ 51.g; Reineke Rebuttal ¶ 12, and (2) after Mr. Martin raised a question regarding some

---

**16.** Defendant's expert Mr. Martin has taken an approach to the accuracy of the Koch data that differs markedly from his approach to the Joint Data Base. When evaluating the Joint Data Base on behalf of defendant, Mr. Martin spent hours working with plaintiff's expert Mr. Reineke to correct tens of thousands of errors. Martin Tr. 13:18–18:4. In contrast, in his examination of the Koch data, Mr. Martin focused only on the few errors he could identify in the Top 50 lists, then cast those errors as just "examples" of a larger set of errors, even though he could not, or did not, identify other errors. Martin Tr. 201:7–202:13. Also—unlike his approach in his analytical work for the Joint Data Base—Mr. Martin did not attempt to quantify how any of the errors he identified might affect calculation of the Tribe's undercollection damages. Martin Tr. 239:6–241:22.

Koch data that did not fall within particular regulatory time periods included in plaintiff's Tranche One claims, Mr. Reineke acknowledged that, instead of using the effective dates of the 1990 Regulations and the 1994 Regulations to identify appropriate data, he had used the publication dates, and he changed the highest prices on 48 days, Martin Rpt. ¶ 51.h; Reineke Rebuttal ¶ 7.

Fifth, Mr. Martin contends in his report that, because he was unable to find any purchase agreements linked to 36 of the 2,669 leases that appear on the Koch Top 50 lists between January 1980 and August 1990, the entire data base is suspect and cannot be relied upon for summary judgment purposes. Martin Rpt. ¶ 51.b. Plaintiff counters that "[e]ven if there were no purchases on those leases, the absence of any *purchase* on such leases does not undermine Mr. Klager's assertion that these are *offers*." Pl.'s Reply 17. Moreover, as government counsel and its expert Mr. Martin both acknowledge, they simply may not have found the purchase agreements given the difficulty of working with microfiche form in which the Koch records are maintained. *See* Klager Tr. 103:23–105:13 (Mr. Kim, the government counsel) (stating that "we certainly may have made a mistake and not found them"); Martin Tr. 228:22–229:2 (Mr. Martin) (stating that he may have missed purchase statements because "there's an awful lot of fiche in there and it's possible that I've overlooked some"). In any case, the 1974 Regulations do not require that purchases at the highest offered price exist, merely that the offers have been made. In addition, the fact that more than 98% of the Koch Top 50 offered prices are corroborated by documented transactions supports, rather than detracts from, the authority of the Koch Top 50 data.

Sixth, Mr. Martin points to two purchase statements produced by Koch to support the Top 50 lists that Mr. Martin claims are in conflict with the Top 50 data, indicating, according to Mr. Martin, the inherent unreliability of the Koch data. Martin Rpt. ¶ 51.f.

For one of the purchase statements, plaintiff and Mr. Klager concede that there was an error; however, that error was corrected in the next month's purchase statement, and that price was also updated at the same time on the Top 50 list. Pl.'s Reply 19 (citing Klager Tr. 127:6–131.17). In his challenge to the second purchase statement, Mr. Martin contended that, because the purchase statement listed only an average price for the month because it was for an equal daily quantity (EDQ) [17] lease, it could not be part of the daily Top 50 lists. However, Mr. Martin later reversed his position in his deposition after he was questioned by plaintiff's counsel, stating that because the purchase statement was for an EDQ lease, the purchase statement by definition did not contain daily prices for each day of the month, resulting in no conflict between the Top 50 list and the purchase statement. *See* Martin Tr. 207:12–210:14. Moreover, as plaintiff points out, in *Osage III* the court rejected the government's attempts to treat date of delivery (DOD) transactions and EDQ transactions differently when calculating the highest offered price of oil for royalty calculation purposes. *See Osage III*, 75 Fed.Cl. at 470–72; Pl.'s Reply 19 (citing Mar. 10, 2009 Status Conf. Tr. 14:12–17).

Seventh, Mr. Martin argues that, because Koch characterized its Top 50 prices as offered prices "if the lease operator had a full tank of oil ready to sell on that day," the prices were "conditional offers," not formal offers in compliance with the 1974 Regulations. Martin Rpt. ¶ 51(I) (internal quotation marks omitted). Plaintiff counters, and the court agrees, that Mr. Martin's characterization of an offer as "conditional" is incorrect. Pl.'s Reply 22–23. What was "conditional" about such Top 50 prices was not at what lease the price was offered, but whether in fact the purchase would be made and the price paid. Koch would pay that price to anyone with adequate crude oil to sell. *See id.* Plaintiff's expert Mr. Klager made it

---

17. There are two different lease pricing structures at issue for Osage oil. Equal daily quantity, or "EDQ," transaction prices reflect a monthly average price based upon the terms of an agreement that equal volumes are deemed to be purchased and delivered each day of the month. Date of delivery, or "DOD," transaction prices are specific to particular days in the month. *See Osage III*, 75 Fed.Cl. at 470.

clear that such offers were no different than other offers valid under the 1974 Regulations in that many offers were made but never "taken," *i.e.,* paid. *Id.* at 22 (citing Klager Decl. ¶ 9). An offer was not required to have been accepted to be used to calculate royalty values under the 1974 Regulations (although it appears from the purchase agreements identified to the Top 50 lists that an overwhelming majority of the offers resulted in agreements).

For the foregoing reasons, the court believes that the Koch data is sufficiently reliable to fill in the gaps in the Osage Agency's incomplete historical records. Viewed through the prism of the legal standard established by the governing law of *Warm Springs*—that defendant breached its fiduciary duties as trustee for the Osage Tribe by mismanaging both its royalty collection and its investment responsibilities, and that proper discharge of those dual responsibilities required that the government as trustee keep and generate the very records upon which plaintiff would have to now rely to meet a more stringent summary judgment burden of proof as movant—the court finds that the government has failed to raise a dispute regarding material facts that might affect the outcome of the suit sufficient to preclude the entry of summary judgment. This court holds that the Osage Tribe is entitled to damages reasonably estimated based on existing information; the government has raised no genuine issues challenging plaintiff's approach relying on the Koch data.

However, defendant has questioned whether, under the Federal Rules of Evidence, it is proper for the Tribe and its expert, Mr. Reineke, to underpin plaintiff's motion for summary judgment with the Koch Top 50 data to calculate damages on summary judgment. In this case, plaintiff seeks to extrapolate the holdings of the Tranche One trial to the broader Tranche One time periods. It is undisputed that the Joint Database is incomplete because the Osage Agency failed to keep adequate trust records for years. It is also undisputed that the government has consistently failed and refused to fill the gaps in the historical record, citing time and money

concerns. Plaintiff took the initiative to work with Koch to develop the Top 50 lists, thereby gathering data on the highest offered prices outside Osage County and prices offered in Osage County that did not result in sales. Pl.'s Reply 9. Plaintiff's expert Mr. Reineke then used that data to calculate a reasonable estimate of the damages owed it.

The evidentiary tension regarding plaintiff's reliance on the Koch data is created by the interplay between RCFC 56(e) and Federal Rule of Evidence (FRE) 703. Under RCFC 56(e), any affidavit supporting a motion for summary judgment must "set out facts that would be admissible in evidence." RCFC 56(e)(1). For this reason, Mr. Reineke's declaration and expert report regarding the Koch Top 50 data is subject to federal evidentiary requirements regarding admissibility and persuasive effect. At the same time, FRE 703 allows an expert to base an opinion or inference on data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject [and] the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." FRE 703.

This evidentiary tension issue was discussed in telephonic status conferences held with the parties on February 22, 2010, *see* Feb. 22, 2010 TSC Tr., Dkt. No. 491, and March 8, 2010, *see* Mar. 8, 2010 TSC Tr., Dkt. No. 503, and the parties have opposing views of the law. Plaintiff contends that the Koch data is "of a type reasonably relied upon by experts" in his field, making his expert report and damages calculations admissible under FRE 703. Feb. 22, 2010 TSC Tr. 7:20–10:3. Defendant counters that it is entitled to an opportunity to review the underlying Koch data pursuant to RCFC 56(e). *See id.* at 12:15–14:11. In light of this dispute, the court has concluded that a trial is appropriate to address plaintiff's reliance on the Koch data.

In light of the conclusions discussed in this Part III.A. 1.b regarding each of defendant's individual challenges to the reliability of the Koch data, the court finds that, pursuant to RCFC 56(c)(1), the challenges raised by defendant through its expert, Mr. Martin, do

not raise any genuine issues of material fact that must be considered at trial. Instead, the purpose of the anticipated trial is to resolve the question of whether or not plaintiff may rely on the Koch data as an evidentiary matter. For this reason, the court DENIES IN PART plaintiff's motion for summary judgment to the extent plaintiff relies on Koch data to fill gaps in the Joint Database in making its calculation of the proper measure of damages resulting from the government's "offered price" breach from January 1981 to August 13, 1990.

### ii. Other Challenges Regarding the Tribe's Damages Calculations

 In addition to the government's challenge to the propriety of plaintiff's reliance on the Koch data to estimate damages, defendant makes several additional critiques of plaintiff's "offered price" analysis and damages calculations. The court now addresses each of these issues.[18]

First, defendant contends that Mr. Reineke incorrectly gravity-adjusted some royalty payments. According to Mr. Martin, Mr. Reineke "fabricated" some royalty values by "erroneously ... applying a purchaser-specific gravity scale for 268,848 royalty payment transactions in which the prices paid were actually based on the highest posted price ('HPP') identified by the Agency, and not the purchaser's transaction price." Def.'s Resp. 17 (citing Martin Rpt. ¶ 48). According to defendant, plaintiff's approach is incorrect for two reasons: (1) because the HPP value comes from a matrix created by the Osage Agency, which already takes into account the highest postings for each gravity, making adjustment unnecessary, see Def.'s Resp. 18, and (2) because Mr. Reineke's analysis creates historical "offered prices" that never existed, id. Defendant's expert opines

that, as a result of this error, plaintiff has overstated the Tribe's damages by $947,474. Id. (citing Martin Rpt. ¶ 48). Plaintiff counters that defendant has "not produced a shred of evidence" to support this theory. Pl.'s Reply 24. Plaintiff points out that it is to be expected that some purchase prices match the prices the Osage Agency later determined to be the HPP for the preceding month. Id. ("The Osage Agency determined the HPP based on what people were posting and paying for oil, so it should not be surprising that there are transactions at that price."). The court agrees with plaintiff that defendant is asking the court to draw an inference against the Tribe that is not supported by the evidence and is likely contrary to the facts. Defendant has not shown that its contention raises a genuine issue of disputed fact.

Second, the government argues that there is no way to gravity-adjust the Koch data properly, stating that "Koch may have used several different gravity scales, and there is no way to tell from the Koch data what scale would apply." Def.'s Resp. 14. Mr. Martin therefore advocates applying the 1980s Osage Agency practice of creating a matrix of the highest prices at each tenth of a degree for comparison purposes. Id. (citing Martin Rpt. ¶ 57); Martin Tr. 151:21–152:13. Mr. Martin admitted that the gravity-adjustment practice of the Osage Agency was "unique" and has never been used by any entity before or since. Martin Tr. 151:21–153:15.

Plaintiff counters that the government's methodology is inconsistent with the methodology agreed upon by the parties during the Tranche One trial. Pl.'s Reply 25 (citing Osage III, 75 Fed.Cl. at 469 (stating that "[t]he parties ... agree[d] to the amount of the gravity adjustment deduction to be used in determining royalty undercollections for

---

18. Many of the 19 "major issues" identified by Mr. Martin in his expert report for defendant are related to plaintiff's "offered price" analysis. See Martin Rpt., Exh. C–1. Just as he did in relation to Mr. Martin's challenges to the accuracy of the Koch data, see Part III.A.1.b.i, in a number of these instances, Mr. Reineke responded to Mr. Martin's critiques by correcting or clarifying his calculations, with the result that those issues are no longer in dispute, see Reineke Rebuttal ¶ 2 (revising calculation to reflect data presented by

Mr. Martin showing that the government had paid some royalties not included in the Joint Data Base between February 1986 though December 1986); id. ¶ 3 (describing the experts' collaboration to correct all duplicated, corrected and reversed transactions, resulting in a price change on 23 days); id. ¶ 8 (revising the electronic payment and pricing information for four leases on which modifications were made in writing, thereby changing prices on 18 days).

[the] Tranche One" trial)). Defendant has offered nothing that distinguishes factually the relevant Tranche One trial months from the months included in the 1981 to 1990 time period. Mr. Reineke was reasonable in his method of first determining the highest 40–degree price by normalizing purchase prices, and then gravity-adjusting the highest 40–degree price to the actual gravity of the Osage oil being valued for royalty purposes-using the purchaser's adjustment scale for Osage County. This conclusion is supported by the fact that Mr. Martin used this methodology-not the Osage Agency's "unique" matrix method, Martin Tr. 151:21–153:15–when he served as the expert for the government in *Shoshone & Arapaho Indian Tribes of the Wind River Reservation v. United States*, Nos. 79–458L and 79–459L (Fed.Cl.). Pl.'s Reply 25; Martin Tr. 152:21–157:2. Defendant has failed both to raise a dispute involving a genuine issue of material fact, and, a fortiori, to make a case that plaintiff's approach is somehow unreasonable under the standard of *Warm Springs*, under which inferences are to be drawn in plaintiff's favor. Defendant may not now relitigate this issue. The methodology applied during the Tranche One trial will control.

Third, Mr. Martin and defendant claim that, for approximately 15,199 transactions involving Koch, the Tribe's expert erroneously applied a gravity adjustment for transactions for which the price had already been "deemed" at 40 degrees,[19] leading plaintiff to determine inaccurately the HPP for certain dates. Def.'s Resp. 18. Therefore, according to defendant, plaintiff erroneously normalized these gravities to 40 degrees, resulting in an erroneous $164,483 underpayment calculation. *Id.* at 19. Plaintiff argues that Mr. Martin cannot support his allegation because he does not know the terms of each sale: his theory required him to assume that

these were sales of oil deemed at 40 degrees, and not sales of 30–degree oil for which bonuses were being paid. Pl.'s Reply 27 (citing Martin Tr. 169:6–172:21 (Mr. Martin) (admitting that he did not check available purchase statements to support his theory)). And Mr. Reineke counters that "[t]here is no evidence that the Koch purchases referred to by Mr. Martin have some gravity scale other than the one agreed to in the Joint Data Base for Koch for those months." Reineke Rebuttal ¶ 5. For these reasons, the government's unsupported allegation neither challenges the reasonableness of Mr. Reineke's approach nor creates a dispute concerning a genuine issue of material fact.

Fourth, Mr. Martin and defendant argue that Mr. Reineke used some offered EDQ price data incorrectly. In this instance, defendant argues that plaintiff's Tranche One claims should be treated differently from the three Tranche One trial months because, while the parties at the time of the trial did not know whether disputed transactions were EDQ or Date of Delivery (DOD) transaction, the Joint Data Base has now been updated with this information. Def.'s Resp. 19–20. According to defendant, the Tribe incorrectly treated some EDQ and DOD transactions in the same manner, leading to an overstatement of the damages claim by $30,972. Def.'s Resp. 20 (citing Martin Rpt. ¶ 55). Mr. Martin posits that a unique royalty calculation should be used for these "EDQe" transactions in the Joint Data Base,[20] *see* Pl.'s Reply 28, and that these EDQe prices cannot be compared to daily monthly royalty values, but must be compared to monthly royalty values, Martin Rpt. ¶ 55.

Plaintiff replies that Mr. Martin is making a distinction that exists neither in the law nor in oil industry practice. According to plaintiff, some of the purchases in the Joint Data

---

**19.** When a price is deemed to be at 40 degrees, "it means that the oil is considered to be at 40° gravity for valuation purposes even though the oil is physically not 40° gravity." Martin Rpt. ¶ 49 n. 21. As a result, there should be price adjustment for deemed crude oil at 40 degrees in Osage County. "The practice of deeming was common in the crude oil industry during this time period. Koch often deemed the gravity to 40° for transactions in the 30–40° range. For transactions below 30°, the price was typically

gravity adjusted by $0.005 per tenth of degree." *Id.*

**20.** The term "EDQe," coined by Mr. Martin and Mr. Reineke, is for EDQ purchases made in Osage County that appeared to be monthly transactions for which the sales price was based on a monthly average price. Pl.'s Reply 28; Martin Rpt. ¶¶ 31, 55.

Base are recorded as EDQe transactions—single "monthly transactions" with a monthly average price—while others are recorded as "EDQd" transactions—equal daily sales at each day's varying price. Pl.'s Reply 28. According to plaintiff, Mr. Martin's assertion that the "monthly" EDQe transactions may be compared only to monthly royalty values is incorrect. *Id.* at 28–29. Plaintiff asserts that there is only one kind of EDQ in the industry, and that everyone, including Mr. Martin, agrees that " 'you use the volumes for that day times the price for that day, and you do that for entire month. . . . I used the prices each day of the month for each day's share of [EDQ sales].' " *Id.* (quoting Trial Tr. (Mr. Martin) 1494:8–23, 1495:10–15). The court agrees with plaintiff that Mr. Martin's theory is counter-factual, because "no lessor would sell oil in an EDQd transaction if it could game the royalty value regulation and pay lower royalties by accounting for the same sales volume, at the same total price, as a 'monthly' EDQe sale." *Id.* For these reasons, defendant has failed to create a dispute concerning a genuine issue of material fact regarding EDQ price data.

Fifth, defendant challenges Mr. Reineke's reliance on royalty-volume data to extrapolate royalty-due calculations in the absence of some purchase statements from 1981 through 1987. *See* Def.'s Resp. 30. In order to calculate royalty volume for the Tranche One trial months, both experts multiplied gross barrels times the royalty rate. *See* Martin. Rpt. ¶ 58. While the experts used purchase statements in their analyses to establish gross barrels purchased from the Tribe whenever available, in some instances they had to rely on the Osage Agency's monthly production reports. *See id.*

Mr. Martin disputes Mr. Reineke's decision to compensate for the absence of some purchase statements by adjusting the royalty due to the Tribe each month upward in direct proportion to the royalty barrels reflected in the applicable Oil Production Report but not in purchase statements. Def.'s Resp. 30. Mr. Martin contends that the Oil Production Report is not as accurate as purchase statements, a contention based on his having found some incorrect royalty volumes in the

Oil Production Reports. *Id.;* Martin Rpt. ¶ 58 ("As an example, I analyzed Phillips 66 Company's royalty volumes shown in the Oil Production Report for a two year time period and found that in three instances the royalty volumes were incorrect. . . . I identified incorrect Oil Production Report royalty volumes of 5,291.93 barrels."). As his basis for this dispute, Mr. Martin "create[d] a new average monthly royalty rate that, in his opinion, more accurately reflects the royalty volumes from this period." Def.'s Resp. 30.

> I calculated the average royalty rate by purchaser from data contained in the Oil Production Reports for the period January 1981–December 1987. I [then] compared each purchaser's average royalty rate to that purchaser's monthly royalty rate. For any month in which the monthly rate was 1% less than or greater than the 1981–1987 average . . ., I classified that month's royalty rate as an outlier. I replaced each outlier with a new average royalty rate. . . .

Martin Rpt. ¶ 58. Based on his preferred calculation, Mr. Martin concluded that plaintiff overstated damages by $1,498,172. *Id.*

Plaintiff first counters that the error cited by defendant as an "example"—the Phillips 66 volumes—is the only error identified by Mr. Martin, leading him to infer that "the purchase statements are correct and the production report incorrect." Pl.'s Reply 30. Plaintiff contends that the court should not reject the Tribe's otherwise reasonable estimate based on this single identified error and Mr. Martin's unsupported inference. *See id.* at 30–31. Moreover, plaintiff points out that, but for the missing purchaser statements, reliance on the Oil Production Reports would be unnecessary. *Id.* Because the missing information is a result of the failure of the United States as trustee to maintain proper records, absent a finding of an identified error, the United States is not entitled to any inference that its suggested calculation method is superior to plaintiff's. *See id.* at 30. Second, plaintiff contends that Mr. Martin's assumption that the ratio of a purchaser's royalty and gross barrels should remain constant is speculative. The royalty rate for leases in Osage County were typically either

1/6 or 1/8 of the purchase price and, although an individual lease could be expected to retain the same royalty rate over a seven-year period, there is no evidence to support defendant's assertion that any purchaser would have purchased from the same leases—or the same proportion of 1/6 and 1/8 leases—in that seven-year period. *Id.* at 31.

The court agrees that defendant's proffered calculation method is based on speculation, and is not evidence that gives rise to a dispute concerning a genuine issue of material fact. Because defendant attacks the validity of only three data points for one company, in one month in the Oil Production Report, and does not question Mr. Reineke's method, the court finds plaintiff's estimate of its damages on the basis of Oil Production Reports to be reasonable. Furthermore, Mr. Reineke has offered a correction of his calculations relating to this Phillips 66 transaction.

Sixth, the government argues that, because the Osage Agency allowed Union Oil to pay fewer royalties than it owed in 1981 and 1982 in order to recoup a prior overpayment of royalties to the Tribe, the Tribe may not now claim royalties as damages for those two years. Def.'s Resp. 31 (citing Martin Rpt. ¶ 62). Plaintiff responds that, because the parties have already agreed to the total amount of royalties that were paid to the Tribe between July 1974 and December 2000, the government's approach would have the effect of crediting the Osage Agency with the payment, but reducing the amount of royalties due to the Tribe from Union purchases. Pl.'s Reply 31. The court agrees with plaintiff that defendant's one-sided adjustment cannot be allowed, because it would upset the approach to calculating damages that both experts have been following up to this point, which "[does] not allocate each specific payment to particular months of production." *Id.* at 32. Furthermore, the United States has been credited with all royalties paid to the Tribe, and the government will not be double-paying Union's royalty liability to the

Tribe as a result of this Tranche One calculation.[21]

Finally, the government contends that there are two additional significant discrepancies in plaintiff's calculation of "highest offered price" damages: (1) an $18,239 discrepancy that Mr. Martin attributes to "miscellaneous issues," Martin Rpt. ¶ 63, Exhibit (Exh.) C–1, and (2) a $466,877 discrepancy that he claims is "unsupported" by any calculations, *id.* ¶ 60. When pressed at his deposition to explain these discrepancies, Mr. Martin was unable to demonstrate specifically why either of these numbers reflected an error in Mr. Reineke's calculations. Martin Tr. 251:10–255:3. As to the lesser amount, Mr. Martin offered only his theory that at least part of the $18,239 is likely attributable to transactions that were later reversed and should have been backed out of the totals at that time. *See* Martin Tr. 251:10–254:17. This is a contention that Mr. Reineke disputes, stating:

> During the development of the Joint Data Base, I worked with Mr. Martin to clean up the data. One of the goals was to exclude all duplicated, corrected and reversed transactions. Approximately 56,-123 transactions were eliminated during this process. If the additional transactions now noted by Mr. Martin had been reviewed at that time, they also would have been eliminated from the analysis.

Reineke Rebuttal ¶ 3.

In addition to attacking Mr. Reineke's analysis, defendant is now attacking the Joint Data Base, a data base it developed in conjunction with plaintiff. However, defendant may not defeat summary judgment by simply pointing out calculations it would have performed differently or cannot reconcile, despite having been provided with Mr. Reineke's methodology and underlying data. The court finds that Mr. Martin's disagreement with Mr. Reineke's damages calculations based on Mr. Reineke's reliance on the

---

**21.** Plaintiff makes the following caveat about this issue: "Mr. Reineke's analysis gives the United States credit for having *collected* the royalties listed in the Joint Data Base, but not necessarily for having *deposited* them" in the Tribe's trust accounts. Pl's Reply 32 n. 9. In Tranche Two, plaintiff believes it will be possible to compare Joint Data Base royalty payments to the Andersen statements of account to verify if such royalty payments were, in fact, deposited to tribal accounts; if they were not, plaintiff will seek additional damages at that time. *Id.*

Joint Data Base and purchase statements, is insufficiently supported to create a dispute as to a genuine issue of material fact. The court therefore GRANTS IN PART plaintiff's motion for summary judgment on the "offered price breach" from January 1981 to August 13, 1990 as to the matters addressed in this Part III.A.1.b.ii.

c. Challenges for All Time Periods: July 1974 to December 2000

■ The government contends that plaintiff's claim for undercollection should be reduced for two additional reasons affecting all time periods from July 1974 through December 2000. The government argues that adjustments must be made for taxes paid and for records that plaintiff found illegible. Defendant asserts that the Tribe is not entitled to collect in this action the amounts it would have been obligated each year to pay to the State of Oklahoma as gross production taxes, had the Tribe historically received the royalties it now claims. Def.'s Resp. 27. Defendant further contends that the Tribe must subtract from its damages claim the interest that would have accrued to such amounts. *Id.* at 27–28. In defendant's view, because the Secretary of the Interior was directed by statute "to pay, through the proper officers of the Osage Agency, to the State of Oklahoma, from the amount received by the Osage Tribe of Indians as royalties from the production of oil and gas, the per centum levied as gross production tax," *id.* (internal quotation marks omitted), the Tribe is not now entitled to collect those amounts. According to the United States, the Tribe's tax liability is equal to 5% the amount it received or would have received in royalty interest, or $1,757,050, *id.* at 28 (citing Martin Rpt. ¶ 32). Defendant contends that allowing the Tribe to collect this money now as damages would represent a "windfall" to the Tribe, since it would have been obligated to pay that money out over the 26 years here at issue. *Id.* In support, defendant cites *Warm Springs,* in which the Federal Circuit held that damages for breach of fiduciary duty should be measured by what is necessary "to place the beneficiary in the position in which it would have been in absent the breach." Def.'s

Resp. 28–29 (quoting *Warm Springs,* 248 F.3d at 1371).

In opposition, plaintiff argues that defendant has omitted case law directly on point on this issue, and that precedent dictates that hypothetical back taxes that would have been owed on money never paid to the Tribe need not be subtracted from the compensatory damages it seeks. Pl.'s Reply 33. Plaintiff cites *Hanover Shoe, Inc. v. United Shoe Machinery Corp. (Hanover Shoe),* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), to support its view that " 'courts do not have to reduce a damage award by the amount of taxes that would have to [have been] paid' had the injury not occurred." Pl.'s Reply 33 (quoting *Hughes Aircraft Co. v. United States,* 86 F.3d 1566, 1574–75 (Fed.Cir.1996), *vacated on other grounds,* 520 U.S. 1183, 117 S.Ct. 1466, 137 L.Ed.2d 680 (1997) (mem.) (citing *Hanover Shoe,* 392 U.S. at 503, 88 S.Ct. 2224)). Because plaintiff's approach is approved by settled law, the court finds that the $1,757,050 challenged by defendant as gross production taxes owed to Oklahoma should not be subtracted from the Tribe's damages calculation. *See Kalman v. Berlyn Corp.,* 914 F.2d 1473, 1483 (Fed.Cir.1990) (reversing a district court that had "erred in deducting British corporate taxes from the computation of [damages for] lost profits"); *Boeing Corp. v. United States,* 86 Fed.Cl. 303, 324–25 (2009) (stating that defendant's expert had a "misconception[ ]" that royalty awards should be reduced to account for taxes). Furthermore, this argument has been untimely raised by defendant; the proper time for this challenge would have been during the Tranche One trial, because the damages calculated for all five of the Tranche One trial months would have been affected by this issue if the government were correct.

■ Defendant also contends, through Mr. Martin, that plaintiff has failed to account for all oil royalty payments that were credited to the Tribe for the years in question. Martin Rpt. ¶ 54. According to Mr. Martin, there are certain months in the Joint Data Base for which royalty payments are not credited because the source of that information—mostly handwritten copies of the

monthly Oil Production Report—were in many instances illegible. *Id.* Under the standard established by *Warm Springs, see* Part II, plaintiff's calculation excluding unreliable information cannot be deemed unreasonable. The existence of "illegible" reports should be construed against the government which, as the trustee, was charged with the duty to maintain records. In this case, the court finds that illegible handwritten records may reasonably be excluded from accounting by plaintiff. Mr. Martin subsequently provided plaintiff's expert, Mr. Reineke, with new royalty data, covering the time period between February 1986 through December 1986, that deciphers some of these ineligible handwritten notes. To the extent that Mr. Reineke has since revised his calculations to account for this new data, this issue is now rendered moot. *See* Reineke Rebuttal ¶ 2; Martin Rpt. ¶ 54.

### 2. Breach of Duty to Invest Prudently from Fiscal Years 1973 to 1992

In *Osage II,* this court held that, as trustee of the Osage mineral estate, the United States was required to collect and invest royalties promptly and prudently on behalf of the Tribe in compliance with all applicable legal requirements, "including the federal statute[s] governing the investment of Indian trust funds, 25 U.S.C. §§ 161a, 161b, 162a, applicable regulations, and applicable case law and common law." *Osage II,* 72 Fed.Cl. at 662. The Tribe is entitled to seek damages that stem from the government's failure to carry out its fiduciary duty in this respect.

Following the Tranche One trial, the court established that plaintiff's investment claims—and therefore investment damages— fall into three different categories as a result of the government's breach of three duties of prudent investment: (1) failure promptly to deposit funds to Account 7386 because of unreasonable failure to certify a federal depositary in Pawhuska, OK ("deposit lag breach"); *id.* at 665–66, (2) failure to maintain appropriate cash balances ("underinvestment breach"); *id.* at 665–67, and (3) failure to obtain investment yields in accordance with law ("underperformance breach"), *id.* at

667–71; *see also Osage III,* 75 Fed.Cl. at 465–66.

Because the United States has never provided plaintiff with an accounting of trust revenues and "it is doubtful whether such records still exist," Pl.'s Mot. 15, in order to calculate the damages owed the Tribe for the breaches for the entire period to which the Tranche One trial holdings apply—fiscal years 1973 to 1992—the parties must rely on the data generated for the Arthur Andersen Trust Fund Reconciliation Project (TRP) report (Andersen report) prepared by the contractor for the United States as a "'reasonable estimate' ... of the data the Osage Tribe would have obtained had data been available from [Bureau of Indian Affairs] BIA records." *Osage II,* 72 Fed.Cl. at 669–70. The Andersen report was required by Congress in an effort to correct longstanding problems in accounting for tribal trust funds by BIA. Pl.'s Mot. 14. The report took five years to research and draft, and cost the United States $21 million to complete. *Id.* at 15.

The Tribe claims that it is entitled to $854,631 in deposit-lag damages and $25,717,467 in combined underinvestment and underperformance breaches. Pl.'s Mot. 15. As described below, defendant challenges plaintiff's calculation of each of the three types of investment damages.

### a. Breach of Duty to Make Prompt Deposits to Account 7386 from Fiscal Years 1973 to 1992

Plaintiff seeks damages totaling $797,224 for the deposit-lag breach: the government's breach of its duty to deposit timely royalty payments made to the Osage Tribe. *See* Pl.'s Reply 35. As a result of the Tranche One trial, this court "held that defendant is liable for investment income lost as a result of its failure to meet its own policy objective of depositing royalty payments within 24 hours or no later than the next business day following receipt of payment." *Osage III,* 75 Fed.Cl. at 466 (citing *Osage II,* 72 Fed.Cl. at 665). In particular, after considering testimony regarding the Osage Agency's royalty receipt and deposit practices, the court held that the government's failure to establish a

federal depositary in Pawhuska, OK, breached defendant's duty to make investments on behalf of Tribe within a "reasonable time" because it could not comply with the policy directive of 42 Bureau of Indian Affairs Manual (BIAM) Supplement 3, that required deposit of royalty funds within one business day of receipt. *Osage II,* 72 Fed.Cl. at 664–65 (citing *Cheyenne–Arapaho Tribes of Indians of Okla. v. United States (Cheyenne–Arapaho),* 206 Ct.Cl.340, 512 F.2d 1390, 1394 (1975) ("[W]hile the trustee has a reasonable time in which to make the initial investment ..., he becomes liable for a breach of trust if that reasonable time is exceeded.")). In making this ruling, the court rejected defendant's proposed deposit lag time of three days from the time of royalty collection to the date of deposit as unreasonable. *See generally id.* (defendant's proposed three-day grace period "included an allowance for mailing the deposit to Muskogee and the deposit there of the funds"). For the calculation of damages in the relevant Tranche One trial months, the court ordered the parties to apply an average deposit lag time of 1.4 days to account for a one-business day delay for each check mailed as well as to count intervening weekend days in some instances. *Osage III,* 75 Fed.Cl. at 475.

In order to apply the court's Tranche One trial deposit-lag ruling to the broader Tranche One time periods, plaintiff first counted the minimum lag days for each payment mailed to Muskogee. *See* Pl.'s Reply 35. In accordance with this court's ruling in *Osage III,* for every non-electronic funds transfer (EFT) royalty payment that was mailed to Muskogee before January 1990, plaintiff assumed that the Osage Agency "took at least one business day to process the payment before mailing it, and [that] the payment arrived in Muskogee no earlier than the next business day." *Id.* (citing *Osage III,* 75 Fed.Cl. at 475). Next, plaintiff calculated the "Andersen lag," *i.e.,* any additional lag discernible from the Andersen data. Pl.'s Reply 35. This calculation required, of course, an assumption that the dates of receipt and deposit in the Andersen report are a reasonable estimate of what happened historically. *Id.*

Defendant's first argument against the propriety of plaintiff's application of the court's Tranche One trial deposit-lag holdings to the broader Tranche One time periods is a legal one: plaintiff has failed to establish an applicable money-mandating duty pursuant to the Supreme Court's ruling in *United States v. Navajo Nation (Navajo II),* —— U.S. ——, 129 S.Ct. 1547, 1551, 173 L.Ed.2d 429 (2009). Def.'s Resp. 32–33. According to the government, *Navajo II* requires the Tribe to identify a money-mandating duty in the form of statutory or regulatory prescriptions; here, the court's holding is premised on a "general policy objective" stated in 42 BIAM to deposit payments in 24 hours or less. *Id.* at 33. Defendant relies on the Supreme Court's holding that the analysis of such matters "must begin with 'specific rights—creating or duty—imposing statutory or regulatory prescriptions,' " and that only *"[i]f* a plaintiff identifies such a prescription, and *if* that prescription bears the hallmarks of a 'conventional fiduciary relationship, ... *then* trust principles (including any such principles premised on 'control') could play a role in inferring that the trust obligation is enforceable by damages." *Id.* (quoting *Navajo II,* 129 S.Ct. at 1558 (internal citations omitted)).

Defendant's argument makes it appear that defendant does not believe that the following *Osage II* ruling meets the requirements of *Navajo II:* "[T]he policy objective stated in 42 BIAM Supplement 3 of depositing payments within 24 hours ... sets out a reasonable standard for defendant's discharge of its duties as trustee.... Defendant is liable for investment income lost owing to its failure to meet the policy objective stated in 42 BIAM Supplement 3." *Osage II,* 72 Fed.Cl. at 665 (internal citations omitted).

For its part, the Tribe refuses to reargue *Navajo II,* stating that the court's prior analysis in *Osage I* regarding what constitutes a "money-mandating duty" is not affected by the Supreme Court's latest ruling, which merely "reiterates" existing law. Pl.'s Reply 38. The court agrees. There is nothing in the Supreme Court's *Navajo II* opinion requires this court to revisit its analysis in *Osage I* that led to a conclusion that the

government's fiduciary duty toward the tribe is the result of a number of regulatory and statutory mandates:

> [T]he Government has fully assumed management and operation of the Osage Trust with respect to the calculation and collection of royalties. This is the specific fiduciary duty that plaintiff alleges was established by the Act of 1906 and has since been breached by defendant. The contractual obligation of lessees to make payments to the designated representative of the government has remained largely unchanged in the nearly 100[-]year history of the 1906 Act....
>
> ....
>
> ... Because the statutes and regulations at issue here clearly establish a fiduciary duty to verify that lessees fulfill their contractual obligations to the Tribe by verifying the accuracy of payments made, the court finds that it can fairly be interpreted as mandating compensation for damages sustained from violations of those duties.

*Osage I,* 68 Fed.Cl. at 332–33 (internal quotation marks and citations omitted).

To repeat: "[T]he Government has fully assumed management and operation of the Osage Trust with respect to the calculation and collection of royalties." *Id.* at 332. The "collection of royalties" by defendant is a trust responsibility. The court's view is that the trustee was obligated to handle collections and the deposit of collections in accordance with a "reasonable standard." This "reasonable standard" is not to be now imposed by the court in some exercise of hindsight; rather, the reasonable standard was set by the trustee itself. The trustee cannot complain of being charged with a breach for a failure to meet its own contemporaneous "policy objective" stated in 42 BIAM Supplement 3. *See Osage II,* 72 Fed.Cl. at 665.

Defendant also makes a number of challenges to plaintiff's deposit-lag damages calculations, arguing in its response that there is a genuine issue of material fact as to the length of the lag time assumed by the Tribe to calculate damages. Def.'s Resp. 34–38. Defendant and its expert, Mr. Chavarria,[22] argue against plaintiff's use of the Tranche One trial assumption that all non-EFT payments prior to January 1990 were mailed. Def.'s Resp. 35. Mr. Chavarria also argues that the use of the court's 1.4–day lag time estimate from the Tranche One trial is unreasonable because: (1) transactional-level Andersen report data is now available to pinpoint which payments were mailed over a weekend or holiday, and (2) there is evidence that, in some cases, payments were deposited within one day of receipt. Def.'s Resp., Exh. H, Declaration [and Report] of Gregory J. Chavarria (Chavarria Rpt.) ¶¶ 26–31, Dkt. No. 420; Def.'s Resp. 36–38.

Defendant argues in the alternative that even if the 1.4–day lag assumption is correct, plaintiff has misapplied the figure. Def.'s Resp. 36–37. In defendant's view, the court held that the 1.4–day number was an acceptable average lag for all transactions at issue, only because it was impossible to tie a specific collection to a specific lease. *Id.* The defendant contends that "[t]he purpose of an average lag time is to approximate the lag for all transactions, not just those where the average lag increases the [Tribe's] damages." *Id.* at 37. The government argues that the Tribe's approach artificially increases damages for transactions for which there were 0 to 1 lag days, while still allowing plaintiff to calculate actual lag time damages for delays over 1.4 days. *Id.* at 37.

Where reasonably accessible and consistently reliable data exists, the court will, of course, rely on it. However, Mr. Chavarria's argument is inconsistent with the court's Tranche One trial holdings. Mr. Chavarria's proposal to accept all the Andersen data at face value was rejected in the Tranche One trial, *Osage III,* 75 Fed.Cl. at 475 ("The court is not persuaded that defendant's lease-by-lease basis of determining deposit lag provides a fair representation of the actual lag time of deposits for rents paid with respect

---

**22.** Mr. Gregory J. Chavarria was qualified by the court as defendant's expert "in accounting, particularly accounting related to tribal trust funds held in trust by the United States, including funds of the Osage Tribe." *Osage II,* 72 Fed.Cl. at 635 n. 8. The Declaration [and Report] of Gregory J. Chavarria (Chavarria Rpt.) was submitted to the court as Exhibit H to defendant's Response. Def.'s Resp., Exh. H, Chavarria Rpt., Dkt. No. 420.

to January 1976."), and the government has not provided justification why it would now be appropriate to calculate deposit-lag damages for the broader Tranche One time periods in a different manner. And Mr. Chavarria's suggestion that it may have taken fewer than 24 hours to process royalty payments is inconsistent with both this court's *Osage II* holding regarding the one-day processing minimum and with defendant's opening position that a three-day grace period would be a reasonable estimate for the time needed to collect, process and deposit royalty funds. *Osage II*, 72 Fed.Cl. at 664–65; Trial Tr. 1854:3–18.

Defendant further challenges plaintiff's calculation of deposit lag damages by arguing that there is a genuine issue of material fact regarding whether the United States was obligated to establish a federal depositary in Pawhuska prior to 1976, and therefore plaintiff has overstated damages for the period preceding the earliest Tranche One trial month. Def.'s Resp. 39. Defendant believes that the court's Tranche One trial ruling "held only that the United States 'breached its trust duty by failing to request designation of a local depositary *prior to the Tranche One [trial] months'* but did not make any finding as to a specific month and year in which the United States was obligated to establish the depositary." *Id.* (Quoting *Osage II*, 72 Fed.Cl. at 664). According to defendant, the court's ruling was based on its calculation that the increased interest that could have been earned on trust deposits in February 1976 had a local depositary been established in Pawhuska would have exceeded the costs to Treasury of establishing that depositary; the Tribe "made no attempt to establish any breach prior to January 1976." *Id.* at 39–40. Accordingly, defendant argues that summary judgment is inappropriate. *Id.* at 40.

Plaintiff counters that there are a number of reasons why it is appropriate to apply the court's Tranche One trial holdings to the time period beginning with fiscal year 1973 (reaching back to July 1972), even though the analysis conducted to support litigation of the Tranche One trial issues began with fiscal year 1976 (reaching back to July 1975). Pl.'s Reply 37. First, the policy objective that established the legal standard for depositing royalty payments within one business day was 42 BIAM Supplement No. 3, Release 3, that was issued on June 5, 1972, justifying its application to the time preceding the Tranche One trial holdings. Pl.'s Mot. 15. Second, the Arthur Andersen report on which much of this case hinges starts in fiscal year 1973, commencing on July 1, 1972. *Id.* Third, defendant has never provided the Tribe with "complete records showing when each royalty payment was received and deposited in fiscal 1973 to fiscal 1992, and it is doubtful whether such records exist." *Id.* Fourth, defendant has adduced no evidence to suggest that the government's policies for deposits was any different for the fiscal years preceding fiscal year 1976. Pl.'s Reply 37. Fifth and finally, because fiscal years 1974 and 1975 were pre-EFT years, the court's holding regarding the cost effectiveness of a local depositary holds equally for the prior period as well. *Id.*

In addition, defendant's assertions concerning plaintiff's burden on summary judgment are incorrect. Defendant states, incorrectly, that to prevail on summary judgment, plaintiff is required to "prove as a matter of law that the United States was obligated to request the opening of a federal depositary prior to January 1976 and that Treasury would have, in fact, opened such a branch based on the cost-benefit analysis conducted in [the] Tranche [One trial]." Def.'s Resp. 40. The legal environment within which the government failed as trustee to discharge its responsibilities was unchanged between June 5, 1972 and 1990. The issue is the breach of a fiduciary duty and the failure of the government as trustee to follow its own best practices on behalf of its trust beneficiary. It is therefore entirely reasonable for the court to apply its Tranche One trial holding and the cost-benefit analysis from February 1976 to the months preceding. Defendant has offered no evidence that suggests any difference between those months and the earliest exemplar month considered by the court in the trial regarding Tranche One. Defendant has raised no genuine issue of material fact that could defeat summary judgment.

It was after the 1990 establishment of the Pawhuska depositary that prompt deposit of royalty payments became possible and routine. *See* Def.'s Resp. 40. Also, in and after 1990, a vast majority of such transactions involved EFT payments. Therefore, plaintiff's Tranche One claims for any deposit-lag damages shall not include any amounts accrued after the establishment of the federal depositary in Pawhuska.

For the foregoing reasons, the court GRANTS IN PART plaintiff's motion for summary judgment regarding the government's breach of the duty to make prompt deposits to account 7386 from fiscal years 1973 to the date of the establishment of the depositary in Pawhuska in 1992.

b. Breach of Duty to Invest Prudently Funds in Accounts 7386 and 7886

██ Plaintiff claims $12,697,811 in damages related to the two government breaches of investment-related fiduciary duties to the Osage Tribe. Pl.'s Reply 38. The first breach, the government's failure to maintain appropriate cash balances in the Tribe's trust funds, *Osage II*, 72 Fed.Cl. at 665, is also called the "underinvestment" breach. *See Osage III*, 75 Fed.Cl. at 466. Following the Tranche One trial, the court held that the government was liable for damages stemming from the Osage Agency's failure to keep a maximum of $25,000 on hand as uninvested cash in violation of its own policies. *Osage II*, 72 Fed.Cl. at 667. The second government breach is its failure to obtain adequate investment yields on trust moneys in accordance with law. *Id.* Following the Tranche One trial, the court held that the Tribe is entitled to damages caused by the government's failure to achieve the investment returns that its own standard of prudence and statutory mandates required. *Id.* at 670–71. This breach is also called the government's "investment underperformance" breach. *See Osage III*, 75 Fed.Cl. at 466. The court now addresses the parties' arguments related to calculation of the Tribe's damages resulting from these investment breaches.

i. Underinvestment Breach

At trial, plaintiff claimed that "the United States lost a substantial amount of interest income [owed the Tribe] by keeping unreasonably large balances in the cash account." *Osage II*, 72 Fed.Cl. at 665 (internal quotation marks omitted). As evidence, plaintiff pointed to a cash balances as high as $18,269,986.53 at one time during the Tranche One trial months. *Id.* At trial and in post-trial briefing, defendant did not respond substantively to this issue. *Id.* The court adopted as applicable the standard established by the Court of Claims in *Cheyenne–Arapaho:* " 'In the absence of a showing by defendant of specific immediate budgetary commitments by the tribes, claimed liquidity needs should be considered in the light of the actual history of the tribe's funds.' " *Id.* at 666 (quoting *Cheyenne–Arapaho*, 512 F.2d at 1395 n. 9). The court found that the BIA policy to invest cash surpluses in excess of $25,000 in certificates of deposit (CDs) or Treasury bills (T-bills) was the proper investment standard for the Osage Agency in this matter. *Id.* at 667. In setting this $25,000 amount, the court noted that the analysis performed by defendant's own investment expert, Charles R. Lundelius, "[did] not require holding any Osage funds in cash balances and instead provides for all shortterm liquidity needs to be covered by investments in T-bills." *Id.* at 666. In plaintiff's view, this standard remains applicable throughout the entire period covered by the Andersen Report, from fiscal years 1973 to 1992, and the five months that were analyzed during the Tranche One trial are a suitable proxy for the broader Tranche One time periods.

Defendant disagrees, arguing: "As we have now gotten beyond the isolated months at issue in [the] Tranche [One trial], it is entirely appropriate to analyze the 'specific budgetary commitments' of the Osage in order to determine if summary judgment on this claim is appropriate." Def.'s Resp. 42–43. Defendant asks the court to deny plaintiff's Motion in order to consider evidence demonstrating that $25,000 in cash could not have covered the Tribe's liquidity needs because, in some months, the Tribe's liquidity

needs exceeded $100,000. *Id.* at 43; *see, e.g.,* Def.'s Resp. 43, Exh. K (indicating that the Tribe's Council budget alone required $25,000 per month for one quarter of 1989); Def.'s Resp., Exh. L (1973 BIA memorandum stating that the Tribe required $50,000 per month to cover "annual budget and gross production tax and other approved obligations"). Defendant insists that plaintiff must provide evidence that its liquidity needs could have been met by its investments held in T-bills in addition to the $25,000 in cash; "[p]laintiff cannot rely on inference and supposition," and asserts that Mr. Lundelius' expert report was focused only on the Tranche One trial months and cannot be extrapolated to support plaintiff's claim. Def.'s Resp. 44.

The court agrees with defendant that if it were to hold a trial to investigate the actual liquidity needs of the Tribe for all 223 months included in fiscal years 1973 through 1992 that have not yet been tried, it is quite likely that in some months the Tribe's liquidity needs may well have exceeded $25,000 in cash; the court further agrees that Exhibit K to defendant's Response likely indicates such an occurrence. However, that potential conclusion is irrelevant, because "BIA policy, as presented by defendant at trial, was to invest cash surpluses in excess of $25,000 in CDs or in U.S. T-bills." *Osage II,* 72 Fed.Cl. at 667 (citing trial testimony of Charles Reynold Lundelius, Jr.,[23] Trial Tr. 2098: 11–25, 2100: 14–21); *accord Blankenship v. Boyle,* 329 F.Supp. 1089, 1096 (D.D.C.1971) (holding that the maintenance of a large amount of cash where "income and outgo were constant" and where government securities could be redeemed on short notice violated the "fiduciary obligation to maximize the trust income by prudent investment"). There is simply no evidence that cash and government securities redeemable on short notice would not have covered the Tribe's liquidity needs. Defendant's attempt to create a genuine issue of material fact based on hypotheticals and speculation is unavailing.

[23.] Defendant's expert Charles Reynold Lundelius, Jr. was qualified by the court as an expert "on investment evaluation, including the determination of the prudence of investments and

### ii. Investment Underperformance Breach

Regarding the government's duty to invest amounts in excess of $25,000 in cash, following the Tranche One trial, the court held that the government was obligated prudently to discharge its investment responsibilities of care and caution by "selecting the highest[-]yielding investment instruments of suitable maturity available for trust funds." *Osage II,* 72 Fed.Cl. at 667–68 (internal quotation marks omitted). Defendant's expert Mr. Lundelius proposed "an expected rate that a prudent investor could have achieved during this time period under the constraints imposed by the duties of care and caution." *Id.* (citing Defendant's [2006] Post–Trial Brief (Def.'s 2006 Post–Tr. Br.) 47, Dkt. No. 234). This "prudent investor" rate was accepted by both parties, *Osage II,* 72 Fed.Cl. at 668, and was defined as "a combination of contemporaneous 3–month CD rates (80%) and 3–month Treasury bill rates (20%), to reflect the rates of return on investments available to the Osage funds on a quarterly basis" during the Tranche One trial months. Def.'s 2006 Post–Tr. Br. 47–48.

Because of missing trust records, the court held that, in calculating the Tribe's interest damages, the *Warm Springs* standard resolving doubts against the trustee would control. In particular, the court assumed:

for each of the Tranche One [trial] months, the average daily cash balance was the same as the average daily cash balance for the year (as nearly as such amount may be determined) in which that Tranche One [trial] month occurs. The court will also assume that, for each of the Tranche One [trial] months, the average daily investments of Osage tribal income from the Tranche One [trial] leases in CDs and T-bills was proportional to the average daily investment in CDs and T-bills of all funds in account 7386 for the year (as nearly as such amount may be determined) in which that Tranche One [trial] month occurs.

investment practices, financial analysis, including the calculations of rates of return, ... accounting, auditing, and damages." *Osage II,* 72 Fed.Cl. at 635 n. 8.

*Osage II*, 72 Fed.Cl. at 671. Applying this methodology to each of the months in fiscal years 1973 to 1992, plaintiff has concluded that it is owed damages of $12,697,811 on its motion for summary judgment. *See* Pl.'s Reply 38, Exh. 5, Exh. 8.

In opposition, defendant contends that plaintiff and Mr. Reineke have made a host of errors in their calculation of damages owed the Tribe based on improper application of the Tranche One trial analysis to various aspects of the broader Tranche One time period at issue in plaintiff's amended motion for summary judgment. Based on these contentions, defendant asserts that plaintiff's underperformance claims cannot be resolved on summary judgment. Each of defendant's arguments is discussed in turn below.

### a) Plaintiff Improperly Accounted for Interest Payments Made to the Tribe

The government and Mr. Martin contend that the Tribe and Mr. Reineke have made a host of errors that have led plaintiff to undercount actual interest payments credited to the Tribe's accounts by the Osage Agency, and therefore to overstate damages owed to the Tribe. Def.'s Resp. 45–47.

### i) Interest Payments to the Tribe: Fiscal Years 1973–1977

■■ The first error alleged by defendant is that there is a genuine issue of material fact regarding the proper accounting of interest credited to the Tribe for fiscal years 1973 to 1977. *Id.* The first step in plaintiff's damages calculation was to establish the interest payments that were timely paid to the Tribe. Because much of the relevant trust data is missing, plaintiff relied on the Arthur Andersen statements of account. *See* Pl.'s Mot. 19. For each year, plaintiff added the receipts recorded in three categories: (1) Treasury or Overnighter Interest, (2) Interest on CDs and (3) Interest on Government Securities. *Id.* at 20.

The government disputes this approach, claiming that plaintiff failed to include interest payments totaling $942,938.36 that were credited to the Tribe's trust accounts in fiscal years 1973 through 1977, leading plaintiff to

overstate its damages related to underperformance. Def.'s Resp. 46; Chavarria Rpt., Exh. 2, 5–6. According to defendant, there were a number of reports available to plaintiff substantiating these amounts, but plaintiff "ignores these interest payments." Def.'s Resp. 46. In its reply, plaintiff withdrew its motion for summary judgment solely regarding the "dispute over whether the transactions in columns B, C, and D of Exhibit 5, Schedule IA of Mr. Chavarria's expert report" should have been included in plaintiff's calculations as credits to the government. Pl.'s Reply 39.

In light of plaintiff's partial withdrawal of its motion, the court held an evidentiary hearing on November 10, 2009, in an attempt to focus the dispute regarding whether the transactions in Schedule 1A of Exhibit 5 to Mr. Chavarria's expert report should be counted as interest credited to the Tribe, as defendant asserts. For the following reasons, the court finds that a trial is necessary to determine if defendant is entitled to a credit for interest payments to the Tribe in fiscal years 1973 through 1977.

■■ The purpose of the evidentiary hearing was to understand the accounting record evidence while taking into account the deference owed to the Tribe's damages calculation under *Warm Springs*. *Warm Springs* establishes that "if a trustee fails to keep proper accounts, all doubts will be resolved against him and not in his favor." *Warm Springs*, 248 F.3d at 1373 (internal quotation marks omitted). Given the relationship between the parties, *Warm Springs* requires that any ambiguities are to be resolved in the Tribe's favor. Despite this presumption, however, defendant has an opportunity to meet its burden of "explanation or justification," *Warm Springs*, 248 F.3d at 1374, and the court has an obligation to understand and apply the evidence "as best it can under the circumstances," *id.* at 1373. To this end, the court heard testimony at from the two witnesses upon whom the government relies in arguing that plaintiff has understated interest paid from 1973 to 1977: Mr. Chavarria

and Mr. Robert Winter.[24]

Underpinning the government's argument is data presented by Mr. Chavarria as an exhibit to his expert report. Mr. Chavarria identified a discrepancy between what he called the "actual interest postings in accounts 7386 and 7886 from the Tribal Trust account data used by Arthur Andersen" and the credits identified by plaintiff in its claims for fiscal years 1973 through 1977. Chavarria Rpt. ¶ 12. In fact, plaintiff credited no interest payments in 1973, 1974, 1975, or 1976 and credited only partial payments in 1977. Id. ¶ 13. Mr. Chavarria therefore focused his analysis on those years. Schedule 1A to Exhibit 5 of Mr. Chavarria's Report is a chart titled "Reconciliation of Plaintiff Cash–Basis Interest Postings to Accrual–Basis Interest Earnings." In Schedule 1A, Mr. Chavarria presents three columns of data under the overall heading "Interest Excluded by Plaintiff": Column B is "U.S. Treasury/Overnighter," Column C is "CD and Gov't Security" and Column D is "Other." According to Mr. Chavarria, the Tribe failed to credit the government with interest payments made in these categories for fiscal years 1973 through 1977 in an amount totaling $942,938.36. See Chavarria Rpt. ¶ 12.

Defendant argues that plaintiff's miscalculation is the result of its decision to credit only the amounts listed in the Andersen summarized statements of account as (1) Treasury or Overnighter Interest, (2) Interest on CDs and (3) Interest on Government Securities and not to rely on any of the supporting documentation available to Andersen. Defendant's Opening Post–Trial Brief Regarding Interest Credits for 1972–77 (Def.'s Post–Tr. Br.) 3, Dkt. No. 453. According to the government, the flaw in plaintiff's approach is that the Arthur Andersen Trust Fund Reconciliation Project (TRP) treated interest for fiscal years 1973 through 1977 differently than it did for subsequent years, because

only in 1978 did the Department of the Interior start using a revenue code specific to Treasury interest. See id. Based on this circumstance, part of the Andersen TRP was to "recalculate what treasury interest earnings should have been for the period of 1978 to 1992," Evidentiary Hearing Transcript of Nov. 10, 2009 (Hearing Tr.) 120:23–24, Dkt. No. 451; however, recalculation for prior years was not performed. Therefore, in defendant's view, the Andersen statements of account for the years before 1978 showed too few interest credits, Def.'s Post–Tr. Br. 3, requiring one to "look beyond the Statements of Accounts' summary pages and investigate 'other' receipts in the supporting detail for those account statements" in order to account properly for interest payments made to the Tribe. Id. at 4.

At the November 10, 2009 evidentiary hearing, counsel for both parties questioned defendant's witnesses, Mr. Chavarria and Mr. Winter, about this contention. Supporting evidence was presented in the form of cross-references of data points between the Andersen report and other documents, such as investment reports and account statements for accounts 7386 and 7886, leading the government to label as interest certain payments it alleges were ignored by plaintiff in its damages calculations. See, e.g., Hearing Tr. 47:5–48:24, 128; Chavarria Rpt. ¶¶ 13–15. In order to identify these payments, Mr. Chavarria searched for a number of transaction codes that, in his experience, indicate interest-related transactions in tribal trust documents: "9701," the code used regularly from 1978 forward (used earlier in the records for some tribes) to indicate Treasury or Overnighter interest, see Def.'s Post–Tr. Br. 4; Hearing Tr. 120:25–121:15; "AW," a code associated with "investment transactions," Chavarria Rpt. ¶ 13; Hearing Tr. 126:25–127:4, and transactions posted to account 7886, "the account designated and utilized for all of the subsequent [T]reasury

24. Mr. Winter provided a declaration for the government on June 24, 2009, and it is upon this declaration that Mr. Chavarria relied in making his assertions about the coding of uncredited interest payments from 1973 to 1977. Def.'s Resp., Exh. 18, Chavarria Transcript (Chavarria Tr.) 38:10–39:6, 44:6–45:15, Dkt. No. 420. The Winter Declaration (Winter Decl.) is Exhibit 4 to the Chavarria Declaration [and Report], which is Exhibit H to defendant's Response. See Def.'s Resp., Exh. H, Chavarria Rpt., Exh. 4, Winter Decl., Dkt. No. 420. Id. Mr. Winter is the Acting Deputy Special Trustee—Trust Services for the Office of the Special Trustee for American Indians, U.S. Department of the Interior. Id. ¶ 1.

interest postings" and general ledger account number 10290, "also an account used primarily for interest received," Hearing Tr. 126:13–19.

Defendant offers two additional forms of support for Mr. Chavarria's identification of these transactions as interest payments that should have been credited by plaintiff. First, Mr. Chavarria's conclusion that transactions marked with transaction codes "9701" and "AW" and those related to account 7886 were likely interest credits made to the Tribe is corroborated by the declaration of Robert Winter. Mr. Winter stated that, based on his review of the accounting documents, AW payments "denote interest or investment earnings transactions" and 9701 payments "reflect Treasury Overnighter interest or statutory interest posted to the Osage Tribal accounts." Chavarria Rpt., Exh. 4, Declaration of Robert J. Winter (Winter Decl.) ¶ 4. Second, and more persuasively, for the amounts in Column B of Mr. Chavarria's analysis, "to confirm the validity of his analysis, Mr. Chavarria applied the same analysis to fiscal year 1978, a year where there is no dispute between the parties (likely because the TRP interest recalculation now allows the summary pages to fully reflect this analysis)." Def.'s Post–Tr. Br. 5. The figures at which Mr. Chavarria arrived for 1978 agreed with plaintiff's calculation for 1978. Hearing Tr. 140:17–25. According to defendant, this comparison demonstrates that "the type of information used by Arthur Andersen in the TRP and relied upon by [p]laintiff for interest calculations for 1978 is the same as what Mr. Chavarria's analysis relied upon for fiscal years 1973–77." Def.'s Post–Tr. Br. 5.

The court agrees with plaintiff that this new analysis performed by defendant "must be met with great skepticism" following the standard of *Warm Springs*. Plaintiff Osage Nation's Post–Trial Response Brief Regarding Interest Received for Accounts 7386 and 7886 in United States Fiscal Years 1973 to 1977 (Pl.'s Post–Tr. Resp.) 2, Dkt. No. 455. Plaintiff advocates that "[e]quity here is to hold the trustee to the same standard of proof it set for itself in the Andersen report." *Id.* Moreover, it is clear that while plaintiff has repeatedly pressed the government for a more complete accounting of the tribal trust records for the Osage and other tribes, the government has refused on the grounds that such exercises would not be cost-effective. *See* Plaintiff Osage Nation's Opening Post–Trial Brief Regarding Interest Received for Accounts 7386 and 7886 in United States Fiscal Years 1973 to 1977 (Pl.'s Post–Tr. Br.) 11–12, Dkt. No. 454. However, now that performing a more thorough analysis of the data may financially benefit the government, it has "picked a few of the gaps in the investment analysis where it thinks it can gain some ground, and revise[d] those based on a small selection of documents that Andersen was told not to analyze." *Id.* at 12.

Nonetheless, the court agrees with defendant that the limited question regarding a proper accounting of interest credits for fiscal years 1973 through 1977 is distinguishable from the scenario presented in *Warm Springs*. Here, the government is arguing that plaintiff's reliance on the Andersen statements of account for the years preceding 1978 is "unreliable" given the fact that the Arthur Andersen accounting team treated interest for fiscal years 1973 through 1977 differently than it did for the rest of the TRP time frame from 1978 forward. *See* Def.'s Post–Tr. Resp. 5, 8. For this reason—because the Andersen report specifically avoided making the calculations for the time period at issue—the court believes that as the trier of fact, it must weigh which side has the better of the argument resolving the point. The court concludes that, based upon the evidence presented by Mr. Chavarria and Mr. Winter at the evidentiary hearing on November 10, 2009, defendant is entitled to an opportunity to counter plaintiff's calculation of damages regarding the interest credits the government claims are missing for fiscal years 1973 through 1977.

A trial on the matter is warranted. The November 10, 2009 evidentiary hearing did not afford plaintiff the opportunity to respond substantively to the government's new analysis, and it appears that at least some part of the data upon which Mr. Chavarria relied is data that has been unavailable to the Tribe. For example, plaintiff states that it is unfamiliar with the "CUSIP" numbers

cited frequently as well as "other such markers that Mr. Chavarria claimed to have the ability to interpret." Pl.'s Post–Tr. Br. 21. While these documents underlying the Andersen TRP may have been produced to plaintiff in the massive amounts of data in the Andersen database, there was nothing in Mr. Chavarria's expert report, declaration, or prior testimony to highlight for plaintiff-or for the court-that there might be documents of "particular relevance [to the] general ledger codes, CUSIP numbers, or account numbers," Plaintiff Osage Nation's Reply in Support of its Motion to Exclude from Consideration Evidence Presented by the United States in Violation of Rules 26(a)(2) and 37(c)(1) 3, Dkt. No. 465, all of which Mr. Chavarria relied upon in generating the analysis he presented on November 10, 2009, *see* Hearing Tr.

It is undisputed that in preparing his new analysis, Mr. Chavarria went beyond the accounting provided to the Osage Tribe through the Andersen TRP in order to "conclude" that credits were missed by plaintiff in making its calculations. *See* Def.'s Resp. 7–8. The court therefore agrees with plaintiff that at this late date:

> Allowing the trustee to selectively reopen the 1973 to 1977 period would unfairly place the beneficiary in the position of either (a) accepting a systematically skewed revision of the trustee's prior, objective report, or (b) revisiting the entire documentary record to perform for itself the investment analysis the trustee has refused to perform, where some of the documents apparently were not previously produced to it.

Pl.'s Post–Tr. Br. 15. Mr. Chavarria himself admitted that in performing his new analysis, he "disregarded evidence on the trust fund investment reports that appeared to show Osage investment income for account 7386 that is missing from the Andersen report." Pl.'s Post–Tr. Resp. 9 (citing Hearing Tr. 59:17–77:12). While defendant argues that plaintiff has "failed to show that its cross-examination [of Mr. Chavarria] 'would have been materially different had [it] not been caught by surprise' " by the new analysis, Defendant's Response to Plaintiff's Motion to Strike Testimony from the Evidentiary Hearing Held on November 10, 2009, 9 (quoting *Gicla v. United States,* 572 F.3d 407, 411–12 (7th Cir.2009)), Dkt. No. 462, the court cannot see how plaintiff's entire approach to the evidentiary hearing would not have been different if plaintiff had been provided the documents relevant to Mr. Chavarria's testimony. The data expressly relied upon by Mr. Chavarria is exactly the sort of information that plaintiff has been requesting of defendant for the past few years of litigation. As summarized by the Tribe:

> When Congress directed the Department of the Interior to provide an accounting, it reported that it was unable to perform an audit due to the dearth of documentation. Instead Interior produced the Arthur Andersen Reconciliation Project report for fiscal years 1973 through 1992 ("Andersen report"). Despite its moniker, it did not even include a full reconciliation of known transactions, which was impossible due to the absence of records. Interior represented to the Osage Nation that, because of cost constraints and the absence of many records, the Andersen report was as good an analysis as could be done. But, now that the Osage Nation seeks to rely on that report as an estimate for computing damages for breach of investment duties, the United States has changed its tune. The United States here takes the position that it should be able to select a few of the many gaps it purposely left in the Andersen report and fill them with information that benefits the trustee.

Pl.'s Post–Tr. Br. 1. The court concurs, and echoes its analysis from *Osage II,* at which time the court observed that in attempting to reduce the amount of damages owed to the Tribe, the government has, on more than one occasion, created accounting analyses "based on inferences that were entirely favorable to the government," and, in some cases, not supported by evidence. *Osage II,* 72 Fed.Cl. at 670 (rejecting defendant's expert's "forensic accounting" to trace income from investments).

In light of this imbalance, on January 11, 2010, after the close of the parties' posttrial briefing, the Tribe filed Plaintiff Osage Na-

tion's Motion to Exclude from Consideration Evidence Presented by the United States in Violation of Rules 26(a)(2) and 37(c)(1) (Pl.'s Mot. to Exclude), Dkt. No. 461, evidently hoping to avoid a trial of the issue. From the perspective of *Warm Springs*, as the court understands it, the court could rule in favor of the Tribe notwithstanding the factual dispute recently created by the government based on documents and analyses recently disclosed. As a prudential matter, however, the court concludes that a trial is required to resolve a genuine issue of disputed fact regarding interest credits owed to the government as calculated by Mr. Chavarria and reported on his Schedule 1A in Columns B, C and D. The court needs better to understand the reliability of the evidence adduced by Mr. Chavarria and the government as the basis for this new analysis. Plaintiff's January 11, 2010 motion is therefore deemed MOOT.[25]

The court will entertain at trial the question of whether or not the credit amounts to which Mr. Chavarria points were ever actually credited to the Tribe. Even though Mr. Chavarria has expressed confidence that these amounts were calculated as interest owed the Tribe, there is nothing on the face of any of the documents indicating that the interest was actually credited to the Osage Nation. Pl.'s Post–Tr. Br. 6 (citing Hearing Tr. 50:25–51:7). Additionally, Mr. Chavarria's after-the-fact accounting relies on codes assigned contemporaneously to transactions by the Department of the Interior. *See* Pl.'s Post–Tr. Br. 12. Therefore, the reliability of the records will also be a question before the trier of fact.

ii) "Catch-up" Interest Payments to the Tribe: 1982, 1986, 1987 and 1989

 The government alleges that the second error that makes resolution of plaintiff's underperformance claims impossible on summary judgment is that plaintiff did not properly account for interest credits in 1982, 1986, 1987 and 1989. The government contends the Tribe failed to account for "catch-up" interest payments resulting from the fact that some interest from the One–Day Treasury Certificates (Overnighter interest) in which the Tribe's accounts were invested each night were not credited to the Tribe's account for the same period in which they had been earned, but were instead credited to the Tribe by Treasury at a later time. Def.'s Resp. 46 (citing Chavarria Decl. ¶ 8; Chavarria Rpt., Exh. 4; Winter Decl. ¶¶ 2–3).

To this argument, plaintiff replies that the government has not provided any evidence to support its assertion other than statements made by its experts. Pl.'s Reply 40. According to plaintiff, there are no contemporaneous accounting records that prove defendant's theory regarding Overnighter interest credits, nor is either of defendant's experts familiar with Treasury's or Interior's accounting procedures for crediting such interest. *See id.* (noting that neither Mr. Martin nor Mr. Chavarria "were at Treasury or Interior at the time"). Because plaintiff is correct that there is no documentary evidence on the record provided by either Mr. Chavarria or Mr. Winter-and, in fact, Mr. Chavarria admits that there is no way to show how much interest should be reallocated in the disputed years or how the eventual credits made by Treasury were eventually recorded in the Tribe's accounts, *see id.* (citing Def.'s Resp., Exh. 18, Chavarria Transcript (Chavarria Tr.) 102:1–103:2, Dkt. No., 420)—the court finds that defendant's assertions fail to raise a genuine issue of material fact.

iii) Average Daily Balances: Fiscal Years 1973–1977, 1989, 1990 and 1992

 As a third error, defendant asserts that the Tribe incorrectly calculated the average daily balances for fiscal years 1973 through 1977, 1989, 1990 and 1992, an assertion based on an analysis performed by defendant's expert, Mr. Chavarria, of government data produced to plaintiff during

**25.** The court notes that plaintiff is planning to avail itself of the "documents underlying the Andersen statements of account" in making its case under Tranche Two, *see* Pl.'s Reply 32, n. 9 (announcing a plan to use the underlying documents to analyze the Tranche Two question regarding royalties due for minerals other than oil); however, it is unclear to the court whether these documents have yet been produced to plaintiff by the government.

discovery. *See* Def.'s Resp. 45–47. In reply, plaintiff represents that, in drafting its motion, it relied on electronic data produced by the government during discovery without modification. Pl.'s Reply 39. Mr. Chavarria, the government's expert, now asserts that the data produced by defendant to plaintiff in discovery is inconsistent with the Andersen statements of account. *Id.* While plaintiff has inquired about this alleged discrepancy, it has received no response from the government. *Id.* Nonetheless, the Tribe represents in its motion that it is willing to defer to the balances from the Andersen statements as calculated by Mr. Chavarria. *Id.* Given this concession, plaintiff "will expect to hear no dispute" regarding the accuracy of the Andersen statements of account in Tranche Two. *Id.* The court views the matter as resolved.

For the foregoing reasons, the court holds that except for the issue set for trial—whether the government is entitled to credit for payments allegedly made to the Tribe as calculated by Mr. Chavarria and reported on his Schedule 1A in Columns B, C and D of his expert report with respect to fiscal years 1973 through 1977—there are no genuine issues of material fact in dispute regarding the proper accounting of interest credited to the Tribe. With that exception, the court therefore GRANTS IN PART plaintiff's motion for summary judgment as to defendant's underinvestment breach and defendant's investment underperformance breach.

b) Interest Credit Reallocation Between Years

██ The government argues that the Tribe understates the interest earned in some months and overstates the interest earned in others, and that reallocation of some interest is therefore required. Def.'s Resp. 47. According to the government, the Tribe's model of calculating year-by-year damages "leads to calculation of damages for years in which there were, in fact, no dam-

ages and/or understates the degree to which the United States exceeded the prudent investor [standard] in others." *Id.* Defendant argues that, instead of plaintiff's cash-basis accounting model, an accrual-basis accounting model would more accurately calculate these interest damages, to ensure that for months in which the United States exceeded the 80/20 benchmark, the Tribe receives no damages. *Id.* at 47–48.

Plaintiff counters that it is inappropriate to change the accounting to an accrual basis at this time, because the United States in fact kept these Osage accounts on a cash basis, Pl.'s Reply 38, contrary to defendant's assertion that Interior "actually managed" the Osage accounts on an accrual basis. *Id.* at 48. Defendant cites as authority for this assertion only the Chavarria Report at paragraphs 9 and 10 which provide only Mr. Chavarria's opinion that plaintiff's use of cash-basis accounting is improper, and that the Chartered Financial Analyst Institute has established standards regarding the use of accrual accounting for fixed-income securities. Chavarria Rpt. ¶¶ 9–10. Plaintiff points out that Mr. Chavarria himself testified at the Tranche One trial that BIA's finance system is kept on the cash basis of accounting, and that all the TRP statements were prepared on a cash basis. Pl.'s Reply 38 (citing Trial Tr. 2010:1–12; Chavarria Tr. 44:7–44:19, 46:4–53:5). The court agrees with the Tribe that defendant cannot now reconfigure the accounting procedures applied thus far in the adjudication of plaintiff's Tranche One claims to suit its revised litigation strategy.[26]

c) Calculation of Investment Performance Year-to-Year and the Prudent Investor Standard

██ The government argues that the Tribe's calculation of investment underperformance on a year-by-year basis is unreliable, creating a genuine issue of material fact

---

26. The government also seeks support for its proposed reallocation of credits from year to year by citing this court's statement in *Osage III* that if "reallocation would be required 'it of necessity would be performed in Tranche Two of the case, when the remaining years of the ac-

count will be before the [c]ourt.' " Def.'s Resp. 48 (quoting *Osage III,* 75 Fed.Cl. at 477). The court believes that its reference to any possible reallocation was inapposite, given the cash basis accounting system employed by BIA.

related to the correct period to evaluate a trustee's satisfaction of its prudent investor obligations. Def.'s Resp. 49–51. During the Tranche One trial, it was appropriate to look at the issue month by month; however, that justification no longer exists. *Id.* at 49–50. The parties have all the aggregate data on investment returns for the entire Andersen period and can evaluate performance over the entire period. *Id.* at 50. Defendant offers as support a declaration from its proposed expert, Gordon J. Alexander, who opines that a year-by-year basis is not an appropriate way to evaluate whether investments meet the prudent investor standard and that, instead, returns over three, five or ten years would be more appropriate. *Id.* (citing Def.'s Resp., Exh. O, Alexander Declaration ¶¶ 3–12, 17 Dkt. No. 420). Defendant claims that evaluating investment returns in the way Mr. Alexander proposes would reduce the Tribe's damages award anywhere from 6.7% (for a three-year evaluation) to 18.3% (for a 20–year evaluation). *Id.* at 51.

The government also argues that, in years when the United States "overperformed" its investment duties, defendant deserves a credit for the interest earned on behalf of the Tribe. *Id.* Defendant asserts that the cases on which the court relied in *Osage II* for the standard applicable to the trustee as a prudent investor, such as *Mitchell v. United States,* 229 Ct.Cl. 1, 664 F.2d 265 (1981) and *Cheyenne–Arapaho,* the trustee had a choice between two equally secure investment vehicles, one of which guaranteed a floor of 4% returns. *Id.* at 52. Defendant contends that "[i]t requires nothing more than acting in the barest fiduciary capacity to maximize a return upon assets when you are faced with two equally secure investment options." *Id.* Here, however, defendant argues that the United States as the trustee was faced with "a mix of variable investments of differing maturities," and it is "inherently unfair" for the court, in hindsight, to hold the government liable for its failure to achieve the "highest possible rate." *Id.* at 53. For this reason, defendant believes that the 80/20 mix should be viewed as a "ceiling" for the United States' obligations, and the government is therefore entitled to credit for performance

that exceeds that level. *Id.* at 54. Defendant's argument against the standard of "highest possible rate" is with a straw judge and not this court. The argument ignores the fact that the court adopted the 80/20 mix under the "prudent investor" standard, not because the 80/20 mix represented the "highest possible rate" of return.

The government also asserts that there is an issue of disputed fact regarding whether the 80/20 mix is the proper allocation of investments for calculating damages. Def.'s Resp. 56. According to the government, this calculation was developed by defendant only for the Tranche One trial and is not appropriate to calculate damages for the broader time period, and plaintiff has not proved that the 80/20 analysis can be properly applied to months outside the Tranche One trial months. *Id.* at 56. The government further argues that the 80/20 mix is not a valid measure of damages because it is not based on any facts or policies of BIA or Interior, *id.* at 57, nor is there a correlation between the investment mix and the underperformance damages that the Tribe is claiming, *see id.*

The court agrees with plaintiff that defendant's briefing on these issues is misplaced, because the law of the case regarding the prudent investor standard is settled. *See* Pl.'s Reply 38, 40. As the court held in *Osage II,* the Osage Nation is entitled by statute to lost investment income on trust funds that the trustee either failed to collect or properly to invest, and the measure of that lost income is the interest rate that a 7–year T-bill would have earned had the royalties been properly collected and disbursed to the Tribe. *See Osage III,* 75 Fed.Cl. at 480–82. Following the Tranche One trial, the court held that the 80/20 mix was a "floor" that the trustee could have met every year had it acted prudently, and—regarding the Tranche One trial months—the parties stipulated that performance exceeding this minimum in one year could not be credited toward a year where too little interest was earned. *See* Jt. Sub. Pt. II, ¶ 6. Because the court here holds that the Tranche One trial established the law of the case on this issue, the government is attempting to reargue a settled issue. The court unequivocally

adopted defendant's expert opinion at trial as the law of the case for all of plaintiff's Tranche One claims that the 80/20 mix is the correct investment mix. *See Osage II,* 72 Fed.Cl. at 670. The parties shall apply the 80/20 mix in calculating the damages for fiscal years 1973 to 1992.

For the foregoing reasons, the court GRANTS IN PART plaintiff's motion for summary judgment as to interest credit reallocation between years, the calculation of investment performance year-to-year and the prudent investor standard.

B. The Tribe's Ability to Seek Interest Damages Including Interest

 The United States asserts that the majority of the damages the Tribe is seeking—$272,674,337.67 of the $310,229,966.16 requested in plaintiff's Motion—is not the principal amount of damages but is instead the amount that results from the Tribe's application of "multipliers." Def.'s Resp. 61–62. The most significant of these "multipliers" is compound interest. According to the government, the Tribe is not entitled to compound interest for three reasons: (1) interest against the United States is presumptively not allowed pursuant to 28 U.S.C. § 2516(a); (2) the Federal Circuit wrongly decided *Shoshone,* when it held that "[t]ribes are permitted to receive interest on monies that the Government was obligated to collect on behalf of the Tribes under the leases, but did not collect or delayed collecting"; and (3) even if *Shoshone* controls here, it does not authorize plaintiff's use of compound interest. Def.'s Resp. 62–64. These argument are irrelevant. *Shoshone* is controlling, and the law of the case permits compounding.

The government argues in the alternative that, even if compound interest is permitted, the amount is in the discretion of the court, Def.'s Resp. 67, and plaintiff should not prevail in seeking its enormous damages award for several reasons, including that a seven-year compounded rate would be a windfall to the Tribe, that some of plaintiff's claims arose 14 to 35 years ago, while plaintiff does not explain why it did not bring its claims sooner, that plaintiff has not alleged malfeasance by the United States, and that the government has not benefited from the Tribe's royalty undercollection. Def.'s Resp. 68–70.

Plaintiff finds illogical defendant's argument that damages received by the Tribe would constitute a "windfall" because the Tribe did not assume "liquidity risk." *Id.* at 41. Because of the government's breaches, the Tribe was denied the opportunity to earn investment returns or take any liquidity risks; "'the funds at issue here were by definition not subject to any liquidity demands.'" *Id.* (quoting *Osage III,* 75 Fed.Cl. at 481 n. 19). Plaintiff also points out that the government earlier argued that the Tribe could have brought these claims earlier, *id.* at 42 (citing Def.'s Resp. 69–70), and that the court has already excluded evidence of such a government defense, *id.* (citing Trial Tr. 209:17–24). Because defendant has not offered any evidence to explain why the broader Tranche One time period is factually distinguishable from the Tranche One trial months, plaintiff argues that the court should continue to preclude the government from making this argument. *Id.* The question of compounding was fully briefed by the Tribe leading up to the Tranche One trial, and the United States never argued that the application of compound interest would be inappropriate at that stage of the litigation. Pl.'s Reply 41.

The court finds defendant's arguments unpersuasive. The court rejects the government's characterization of plaintiff's damage claim as a "windfall." For the approximately two decades addressed in Tranche One of this case, the government breached its fiduciary duty to collect, invest, and deposit royalty proceeds in Osage tribal trust accounts, denying the Tribe and the individual headright owners the ability to invest such moneys in interest-bearing instruments. The court has determined that the interest that would have been earned had those moneys been invested in 7-year T-bills is a reasonable estimate of the damages suffered by the Tribe and its members for the government's breaches. Further, the court will not permit defendant to relitigate its argument regarding the timeliness of the Tribe's claims. Finally, for the reasons discussed above in Part

I, *supra,* the court engaged in the Tranche One trial in order efficiently to establish the methodologies required to calculate damages for fiscal years 1973 through 1992 using a manageable amount of evidence. The interest method applied to the Tranche One trial months is the law of the case, and the longer time period now at issue will be treated consistently by compounding interest to the benefit of the Tribe.

### C. The Tribe's Standing to Seek Interest Damages

 The government also insists that the Tribe does not have standing to claim the interest damages it seeks. Def.'s Resp. 58–61. According to defendant, even though the Tribe was the beneficiary of the trust, it was required to pass trust proceeds through to the headright holders. *Id.* at 58. Therefore, while the Tribe was entitled to receive certain administrative payments, none of those payments are implicated by this suit. *Id.* According to the government, this court's prior ruling granting the Tribe standing "addressed the more general question of whether the Tribe could have standing to assert any breach of trust claims, without addressing whether it had standing to pursue the specific claims now being litigated." *Id.* The government asserts that the Tribe has failed to allege any damages owed to it as a tribe for these claims. Therefore, the government argues that, even if the Tribe may seek damages, it may not seek interest because interest damages would belong to the individual headright holders. *Id.* at 59–60.

The government's argument ignores the reality that the Tribe is entitled to the income the trust would have earned and eventually distributed to the individual headright owners because the funds have never been distributed. By definition, Osage tribal funds become individual moneys only *after* segregation and distribution, not simply because the regulatory "distribution date comes and goes with the funds never having been collected by the trustee," Pl.'s Reply 41, let alone distributed to the individual headright owners. The authorities cited by the government do not undercut this conclusion. In its brief as movant-intervenor before the U.S.

District Court for the District of Columbia in *Cobell v. Salazar,* No. 08–5500 (D.C.Cir. 2009), the Tribe stated that headright owners' rights to mineral income vest "at the time of the mandatory quarterly segregation and distribution." Brief of Movant–Intervenor the Osage Nation 12, *Cobell,* No. 08–5500. The Tribe's use of the phrase "at the time" clearly refers to the time *when* segregation and distribution actually occurs, not the date on which it *should* have occurred. This conclusion is consistent with the position of the Attorney General of the United States followed by the United States Court of Appeals for the Tenth Circuit. In *Taylor v. Tayrien,* 51 F.2d 884 (10th Cir.1931), in deciding whether individual Osage had the ability to assign headright shares in bankruptcy, the Tenth Circuit relied on a 1921 memorandum from the Attorney General to the Secretary of the Interior establishing that mineral rights were the property of the tribe, subject to the control of the government, until distribution. *Taylor,* 51 F.2d at 891. The court held "that the members of the tribe had no vested interest in the royalties and that [u]ntil they were placed to the credit of the individual Indian, they remained tribal funds." *Id.* (internal quotation marks omitted).

### IV. Conclusion

Pursuant to RCFC 56(c)(1) and in accordance with the foregoing opinion, plaintiff's Amended Motion for Summary Judgment on All Oil–Royalty Under–Collection Claims for July 1974 to December 2000 and All Deposit–Lag, Excessive–Cash–Balance, and Investment–Yield Claims for Accounts 7386 and 7886 for United States Fiscal Years 1973 to 1992 is GRANTED IN PART and DENIED IN PART.

The two questions that remain unresolved and must be resolved at trial are (1) whether plaintiff may rely on price information generated by Koch Industries, Inc. to supplement lease prices contained in the Joint Database, and (2) whether plaintiff has given defendant proper credit for interest payments made to the Tribe from fiscal years 1973 to 1977.

The parties are DIRECTED to submit a Joint Status Report including a proposed

schedule for further proceedings. Following trial, the court will direct the parties jointly to calculate total damages in accordance with the court's opinion.

IT IS SO ORDERED.